IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| COTTON STATES MUTUAL<br>INSURANCE COMPANY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CASE NO:  3:07CV422-WHA |
| VS. | ) |
| | ) |
| MICHAEL GOSDIN and J.G., a minor | ) |
| DEFENDANTS. | ) |
| | ) |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Comes now the plaintiff and, pursuant to Rule 56, Fed. R. Civ. P., respectfully moves the Court to enter Summary Judgment in its favor, granting to it all relief requested in its Complaint, on the grounds that there are no undisputed issues of fact and plaintiff is entitled to judgment as a matter of law.

This Motion is based upon the pleadings and properly authenticated exhibits attached thereto; the depositions of Michael Gosdin and J.G.; and the Affidavit of Deborah D'Ambra, which forms a part of Exhibit "B" to plaintiff's Complaint.

s/George P. Ford
George P. Ford, Attorney for Plaintiff
Ford, Howard & Cornett, P.C.
P.O. Box 388
Gadsden, AL 35902
(256) 546-5432
ASB#4179-066g

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing upon the Clerk of the Court under the CM/ECF system which will send notification of such filing to the following:

Chad Lee, Esquire
P.O. Box 966
Wedowee, AL 36278

On this the 13th day of February, 2008.

s/George P. Ford
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

COTTON STATES MUTUAL            )
INSURANCE COMPANY,
                                )
      PLAINTIFF,
                                ) CASE NO:  3:07CV422-WHA
VS.
                                )
MICHAEL GOSDIN and J.G., a minor
                                )
      DEFENDANTS.
                                )

## EVIDENTIARY SUBMISSIONS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment, plaintiff submits the following evidence:

1. The original Complaint filed in this action.  (Evid. Sub. 1- Cplt.).

2. Exhibit "A" to plaintiff's Complaint, viz:  the Complaint in the "underlying lawsuit" of Miller, et al v. Gosdin, et al, Circuit Court of Randolph County, Alabama (Evid. Sub. 2 – Miller Cplt.).

3. Exhibit "B" to plaintiff's Complaint, a certified copy of the insurance contract in issue in this action.  (Evid. Sub. 3 – Policy).

4. Exhibit "C" to plaintiff's Complaint in this action, viz:  a "Reservation of Rights" letter.  (Evid. Sub. 4 – Letter).

5. Defendants' Answer to plaintiff's Complaint.  (Evid. Sub. 5 –Answer).

6. Deposition of Michael Gosdin and Exhibit thereto. (Evid. Sub. 6 – M. Gosdin Depo.).

7. Deposition of J.G. (Evid. Sub. 7 – J.G. Depo).


s/George P. Ford
George P. Ford, Attorney for Plaintiff
Ford, Howard & Cornett, P.C.
P.O. Box 388
Gadsden, AL 35902
(256) 546-5432
ASB#4179-066g


## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed the foregoing upon the Clerk of the Court under the CM/ECF system which will send notification of such filing to the following:

Chad Lee, Esquire
P.O. Box 966
Wedowee, AL 36278

On this the 13th day of February, 2008.


s/George P. Ford
Of Counsel

# EVIDENTIARY SUBMISSION

# 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

COTTON STATES MUTUAL INSURANCE )
COMPANY, )
                                        )
            PLAINTIFF, )
                                        ) CASE NO: 3:07CV 422 -WHA
VS.                                     )
                                        )
MICHAEL GOSDIN and J.G., a minor        )
                                        )
            DEFENDANTS.                 )

## COMPLAINT FOR DECLARATORY JUDGMENT

1. This is an action for declaratory judgment brought under the provisions of 28 U.S.C. §2201. The Court has jurisdiction of the matter by virtue of diversity of citizenship between the plaintiff and all defendants, pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2. Plaintiff is a corporation organized and existing under the laws of the State of Georgia, but engages in the insurance business within the State of Alabama.

3. Defendants both are individual, resident citizens of the State of Alabama, residing at 9100 County Road 258, Roanoke, Alabama 36274. Defendant Michael Gosdin is the father and natural guardian of defendant J.G. J.G. is believed to be fourteen (14) years of age.

4. On or about April 6, 2006 in Chambers County, Alabama, one J. M., a minor, was struck by a bullet fired from a rifle by defendant J.G., thereby causing certain personal injuries to J. M.

5. On or about December 13, 2006, a civil action was filed in the Circuit Court of Chambers County, Alabama, seeking damages on behalf of J.M. from Michael Gosdin and J.G. for the injuries arising from said shooting incident. Said action is styled as "Leslie Miller as Mother

and Next Friend of J.M., a Minor, versus Michael Gosdin and J.G., a Minor, CV 06-291".

6. Exhibit "A" hereto is a true and correct copy of the Complaint described above.

7. Subsequent to having been served with process in the state court action, defendants Michael and J.G. made demand upon plaintiff to provide them with a defense and indemnity from the claims made in said civil action.

8. Said demand for defense and indemnity, was made under a policy of "homeowners" insurance which had been issued by plaintiff Cotton States to one Charles W. Gosdin, who resides at 9110 County Road, 258, Roanoke, Alabama 36274. Charles W. Gosdin is the father of Michael Gosdin and grandfather of J.G.

9. Exhibit "B" hereto is a true and correct copy of the policy of insurance issued to Charles W. Gosdin.

10. Plaintiff admits that the described policy of insurance was in force at the time of the incident in question, and admits said policy afforded certain liability insurance coverage, subject to all terms, conditions, definitions, declarations and exclusions thereof.

11. After having received the demands for defense and indemnity and analyzing same, plaintiff issued a "Reservation of Rights" letter to Michael and J.G., and began providing them with a defense to the action, subject to said reservation of rights. Exhibit "C" is a true and correct copy of the said Reservation of Rights letter.

12. Plaintiff denies that it has any obligation under the said policy either to defend or indemnify either of the defendants from said civil action or from any judgment rendered against either of them in said action, for that neither defendant falls within the definition of an "insured" in the subject policy of insurance; and avers that a bona fide, justiciable controversy exists between and among it and the defendants herein as the respective rights, duties, liabilities and obligations

existing between and among them as a consequence of the issuance and existence of the subject policy of insurance.

WHEREFORE, plaintiff requests the Court grant the following relief:

(a). that the Court assume jurisdiction of this action;

(b). that the Court appoint a Guardian ad Litem to represent the interest of the minor defendant, J.G.;

(c). that the Court determine and decree that a bona fide, justiciable controversy exists between and among the parties hereto, making this a proper action for a declaratory judgment;

(d). That process of this Court be issued to the defendants and that they be ordered to respond to the Complaint within the time required by law or risk default;

(e). That upon a hearing on the merits of this action, the Court enter judgment relieving plaintiff of the obligation to defend the defendants, or either of them, from the claims made in the state court action, and from the obligations to indemnify defendants, or either of them, from any judgment rendered in favor of plaintiff therein, under the terms and conditions of the insurance policy in question.

(f). That the Court grant such other, further, or different relief as the Court finds proper in the premises.

George P. Ford
Ford, Howard & Cornett, P.C.
P.O. Box 388
Gadsden, AL 35902
(256) 546-5432
ASB#4179-066g

# EVIDENTIARY SUBMISSION

# 2

# EXHIBIT "A"

## IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

LESLIE MILLER as Mother and
Next Friend of J███████ M███
a minor

   PLAINTIFF

VS.

MICHAEL GOSDIN and ███ ᴶ·
G███████ a minor

   DEFENDANT

CASE NO. _CV06-291_

DEC 8 2006

CHARLES M. STORY
CIRC. CLERK
CHAMBERS CO. ALABAMA

### <u>BILL OF COMPLAINT</u>

Comes now Plaintiff and would show unto this Honorable Court the following facts as a basis for the relief hereinafter prayed for:

1.  On or about April 18, 2006, J███████ M███ a minor, born December 18, 1997, was in an area with Defendant J███ G████ a minor, age 12.

2.  To the best of Plaintiff's knowledge and belief, the said J████ G██████ was under the care and supervision of his father, Michael Gosdin, who resides at 9100 County Road 258, Roanoke, Alabama, which is located in Chambers County, Alabama.

3.  On said date the Defendant Michael Gosdin had negligently and/or wantonly allowed J████ G████ to have ammunition and a rifle for his use and benefit knowing that the said J████ G████ was not capable or able to understand the responsibilities associated with use of a rifle and ammunition.

4.    Plaintiff would state that the said J████ G████ through his negligence also caused the rifle to be discharged hitting J████ M███ causing extreme and serious bodily injury to him.  Plaintiff would that state that as a result of the negligence of Michael Gosdin and J███G████ the said J██████ M██ was caused to be hospitalized for an extended period of time; he incurred substantial medical expense; he received permanent injuries; he endured pain and suffering;  and he will be caused to incur medical and doctor bills in the future.

WHEREFORE, Plaintiff demands judgment against Michael Gosdin and J████ G████ for all sums J██████ M██ may be entitled to under the pleadings and proof contained herein.

John A. Tinney    TIN 005
Attorney for Plaintiff
Post Office Box 1430
Roanoke, Alabama  36274
(334) 863 8945

PLAINTIFF DEMANDS TRIAL BY STRUCK JURY OF ALL ISSUES HEREIN.

John A. Tinney
Attorney for Plaintiff

# EVIDENTIARY SUBMISSION

## 3

# EXHIBIT "B"

 244 Perimeter Center Parkway N.E. Atlanta, Georgia 30346-2397
Mailing Address: P.O. Box 105303 Atlanta, Georgia 30348-5303
Phone: 770-391-8600

**G E O R G I A**

Dekalb County

### AFFIDAVIT OF CUSTODIAL OFFICER

PERSONALLY APPEARED BEFORE ME the undersigned officer, lawfully authorized to administer oath and take acknowledgements, Deborah D'Ambra, who after being sworn deposes and says:

THAT: She is Manager of the Underwriting Department and as such officer has custody of the Company's records as they pertain to its policyholders.

FURTHER: That she has examined into the said records of the Company as they relate to application for policy number, AHO3355540, issued to CHARLES W GOSDIN, insured for the policy period 11/29/05 to 11/29/06.

FURTHER: That the attached is a correct copy thereof.

Deborah D'Ambra
Underwriting Manager
Cotton States Mutual Insurance Company

Shield Insurance Company

Sworn and subscribed to before me

This _12_ day of _January_, 2007

NOTARY PUBLIC

RECEIVED
JAN 1? 2007
BY:...................

Cotton States Mutual Insurance Company • Cotton States Life Insurance Company • Shield Insurance Company
CSI Brokerage Services, Inc. • Cotton States Marketing Resources, Inc.

**Cotton States** INSURANCE

10/31/2005

INSURED COPY
HOMEOWNERS POLICY
RENEWAL DECLARATION * * EFFECTIVE 11/29/2005

THIS IS
NOT A BILL
INVOICE TO
FOLLOW

| POLICY NUMBER | POLICY PERIOD | COVERAGE IS PROVIDED BY | AGENCY |
|---|---|---|---|
| AHO3355540 | 11/29/2005 to 11/29/2006 | COTTON STATES MUTUAL INS CO | 872 |

**NAMED INSURED and ADDRESS**

**AGENT**

#BWNCNTT
#AHO3355540872IR8#
CHARLES W GOSDIN
9110 CO RD 258
ROANOKE, AL 36274

MORRISON INSURANCE AGENCY
P O BOX 687
ROANOKE, AL 36274

PHONE: 334/863-2135

THE PREMISES COVERED BY THIS POLICY IS LOCATED AT THE ABOVE ADDRESS.

RATING INFORMATION- FRAME, CONSTRUCTED IN 1980, PRIMARY RESIDENCE,
  PROTECTION CLASS 09, TERRITORY 51, LESS THAN 500 FEET FROM HYDRANT,
  $1000 DEDUCTIBLE APPLIES PER OCCURRENCE 1 FAMILY, FIRE DISTRICT.

COVERAGE AT THE ABOVE DESCRIBED LOCATION IS PROVIDED ONLY WHERE A LIMIT OF
LIABILITY IS SHOWN OR A PREMIUM IS STATED

| SECTION I COVERAGE | LIMIT OF LIABILITY | PREMIUMS |
|---|---|---|
| A. DWELLING | $75,000 | $835.00 |
| B. OTHER STRUCTURES | $7,500 | |
| C. PERSONAL PROPERTY | $37,500 | |
| D. LOSS OF USE | $15,000 | |
| SECTION II COVERAGE | | |
| E. PERSONAL LIABILITY | $100,000 EACH OCCURRENCE | |
| F. MEDICAL PAY. TO OTHERS - | $1,000 EACH PERSON | |
| TOTAL BASIC PREMIUM - - - - - - - - - - - | | $835.00 |
| ADDITIONAL PREMIUMS | | |
| LOSS PREVENTION CREDIT CS-216 | | $33.00CR |
| TOTAL ADDITIONAL PREMIUMS - - - - - - - - - - - | | $33.00CR |
| TOTAL ANNUAL PREMIUM - - - - - - - - - - - - - | | $802.00 |

POLICY PERIOD 12:01 A.M.   STANDARD TIME AT THE RESIDENCE PREMISES.

FORMS AND ENDORSEMENTS - HO-3 04/84, CSH-01 01/02, BP1051H 12/90, CS-216 01/90.

DESCRIPTION OF ADDITIONAL COVERAGES - - - - - - - - - - - - - - - - - - - - - -

LOSS PREVENTION CREDITS
  SMOKE ALARM, DEAD BOLTS AND WOODSTOVE ADJUSTMENT APPLIES.
                ---CONTINUE ON NEXT PAGE---

**Cotton States** INSURANCE®

INSURED COPY
HOMEOWNERS POLICY
RENEWAL DECLARATION * * EFFECTIVE 11/29/2005

THIS IS
NOT A BILL
INVOICE TO
FOLLOW

| POLICY NUMBER | POLICY PERIOD | COVERAGE IS PROVIDED BY | AGENCY |
|---|---|---|---|
| AHO3355540 | 11/29/2005 to 11/29/2006 | COTTON STATES MUTUAL INS CO | 872 |

| NAMED INSURED and ADDRESS | AGENT |
|---|---|
| #BWNCNTT<br>#AHO3355540872IR8#<br>CHARLES W GOSDIN<br>9110 CO RD 258<br>ROANOKE, AL 36274 | MORRISON INSURANCE AGENCY<br>P O BOX 687<br>ROANOKE, AL 36274<br><br>PHONE: 334/863-2135 |

PS-267 04/1989

BY _Charles Roy Martin_
AUTHORIZED SIGNATURE

THANK YOU FOR LETTING US SERVE YOU

# Cotton States Mutual Insurance Company

## A MUTUAL COMPANY — NONASSESSABLE POLICY



**Homeowners
Policy**



**Cotton
States**
INSURANCE

# Our Most Important Policy Is Trust.<sup>SM</sup>

### CONTINUOUS RENEWAL PLAN

Subject to the consent of this company, and subject to the rates, rules and forms then in effect for this Company, this policy may be continued in force by payment of the required continuation premium for each successive policy term. Such continuation premium must be paid to the Company on or before the expiration of the then current policy term and if not so paid the policy shall terminate.

### MORTGAGEE PLEASE NOTE

This is a continuous renewal policy. A current policy declaration need not be mailed to a mortgagee (or trustee) each renewal date due to the conditions set forth below:

YOUR INTEREST WILL BE PROTECTED. UNDER THE TERMS OF THIS POLICY, COTTON STATES MUTUAL INSURANCE COMPANY GUARANTEES YOU THAT YOUR INTEREST SHALL NOT TERMINATE UNTIL THE EXPIRATION OF AT LEAST A TEN (10) DAY NOTICE OF CANCELLATION, SUCH NOTICE BEING MAILED BY CERTIFICATE OF MAILING TO YOUR OFFICES.

THIS POLICY JACKET TOGETHER WITH HOMEOWNERS FORM, DECLARATIONS AND ENDORSEMENTS, IF ANY ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY.

Cotton States Mutual Insurance Company ● 244 Perimeter Center Parkway N.E. ● Atlanta, Georgia 30346

# YOUR HOMEOWNERS POLICY - QUICK REFERENCE

### DECLARATIONS PAGE

Your Name
Location of Your Residence
Policy Period
Coverages
Amounts of Insurance
Deductible

| | | Beginning On Page | | | Beginning On Page |
|---|---|---|---|---|---|
| SECTION I YOUR PROPERTY | AGREEMENT | 1 | SECTION II YOUR LIABILITY | COVERAGES Personal Liability Medical Payments to Others | 10 |
| | DEFINITIONS | 1 | | | |
| | COVERAGES Property Coverages Loss of Use Additional Coverages Debris Removal Trees, Shrubs and Plants Credit Card Loss Assessment | 2 | | EXCLUSIONS | 11 |
| | | | | ADDITIONAL COVERAGES Claim Expenses First Aid Expenses Damage to Property of Others Loss Assessment | 13 |
| | PERILS INSURED AGAINST | 5 | | CONDITIONS Limit of Liability Duties After Loss | 14 |
| | EXCLUSIONS | 7 | | | |
| | CONDITIONS Insurable Interest Duties After Loss Loss Settlement Mortgage Clause | 8 | SECTION I and SECTION II | CONDITIONS Policy Period Cancellation Non-Renewal Automatic Termination | 15 |

IN WITNESS WHEREOF, this company has executed and attested these presents; but this policy shall not be valid unless countersigned by duly authorized Agent of this company at the agency hereinbefore mentioned.

*Paul M. Harmon*
Secretary

*Barbara A Laurer*
President

## MUTUAL POLICY CONDITIONS (APPLICABLE TO COTTON STATES MUTUAL INSURANCE COMPANY)

This policy is issued by a Mutual Company having special regulations lawfully applicable to its organization, membership, policies or contracts of insurance, of which the following shall apply to and form a part of this policy.

This policy is nonassessable. The policyholder is a member of The Company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors of the Company in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

The Insured is hereby notified that by virtue of this policy, he is a member of Cotton States Mutual Insurance Company and is entitled to vote either in person or by proxy at any and all meetings of The Company. The annual meeting of the policyholders is held at the home office of the Company, 244 Perimeter Center Parkway, N.E., Atlanta, Georgia 30346-2397, on the first Tuesday after the fourth Monday of April each year at 10:30 a.m., Atlanta time.

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. **"business"** includes trade, profession or occupation.

3. **"insured"** means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II, **"insured"** also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured**;

   d. with respect to any vehicle to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

      (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:

   a. the residence premises;

   b. the part of other premises, other structures and grounds used by you as a residence and:

      (1) which is shown in the Declarations; or

      (2) which is acquired by you during the policy period for your use as a residence;

   c. any premises used by you in connection with a premises in 4a or 4b above;

   d. any part of a premises:

      (1) not owned by an **insured**; and

      (2) where an **insured** is temporarily residing;

   e. vacant land, other than farm land, owned by or rented to an **insured**;

   f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured**;

   g. individual or family cemetery plots or burial vaults of an **insured**; or

   h. any part of a premises occasionally rented to an insured for other than **business** use.

5. **"occurrence"** means an accident, including exposure to conditions, which results, during the policy period, in:

   a. **bodily injury**; or

   b. **property damage**.

6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.

7. **"residence employee"** means:

   a. an employee of an insured whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or

   b. one who performs similar duties elsewhere not related to the **business** of an insured.

8. "residence premises" means:

a. the one family dwelling, other structures, and grounds; or

b. that part of any other building:

where you reside and which is shown as the "residence premises" in the Declarations.

"Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

---

## SECTION I—PROPERTY COVERAGES

### COVERAGE A—Dwelling

We cover:

1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and

2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises.**

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B—Other Structures

We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for **business;** or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

### COVERAGE C—Personal Property

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured;**

2. a guest or a **residence employee,** while the property is in any residence occupied by an **insured.**

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises,** is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.

4. $1000 on trailers not used with watercraft.

5. $1000 on grave markers.

6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

7. $2000 for loss by theft of firearms.

8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

9. $2500 on property, on the **residence premises,** used at any time or in any manner for any **business** purpose.

10. $250 on property, away from the **residence premises,** used at any time or in any manner for any **business** purpose.

---

**Property Not Covered.** We do not cover:

1. articles separately described and specifically insured in this or other insurance;

2. animals, birds or fish;

3. motor vehicles or all other motorized land conveyances. This includes:

   a. equipment and accessories; or

   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

      (1) accessories or antennas; or

      (2) tapes, wires, records, discs or other media for use with any such device or instrument;

   while in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. used to service an **insured's** residence; or

   b. designed for assisting the handicapped;

4. aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. property in an apartment regularly rented or held for rental to others by an **insured**;

7. property rented or held for rental to others off the **residence premises**;

8. a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media;

   containing **business** data. But, we do cover the cost of blank or unexposed records and media;

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

**COVERAGE D — Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following. However, if the **residence premises** is not

your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

**ADDITIONAL COVERAGES**

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. debris of covered property if a Peril Insured Against causes the loss; or

   b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

Copyright, Insurance Services Office, Inc. 1984

We will also pay your reasonable expense for the removal of fallen trees from the **residence premises** if:

a. Coverage is not afforded under Additional Coverages 3. Trees, Shrubs and Other Plants for the peril causing the loss; or

b. the tree is not covered by this policy;

provided the tree damages covered property and a Peril Insured Against under Coverage C causes the tree to fall. Our limit of liability for this coverage will not be more than $500 in the aggregate for any one loss.

2. **Reasonable Repairs.** We will pay the reasonable cost incurred by you for necessary repairs made solely to protect covered property from further damage if a Peril Insured Against causes the loss. This coverage does not increase the limit of liability that applies to the property being repaired.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft.

The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant. We do not cover property grown for **business purposes.**

This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a. the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b. loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c. loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

d. loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a. by a resident of your household;

b. by a person who has been entrusted with either type of card; or

c. if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured.**

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners. This only applies when the assessment is made as a result of each direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A—Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Case 3:07-cv-00422-WHA-WC Document 22-5 Filed 02/19/2008 Page 12 of 20

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

   a. Perils Insured Against in Coverage C – Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

   b. hidden decay;

   c. hidden insect or vermin damage;

   d. weight of contents, equipment, animals or people;

   e. weight of rain which collects on a roof; or

use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

### COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;

2. caused by:

   a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

      (1) maintain heat in the building; or

      (2) shut off the water supply and drain the system and appliances of water;

   b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

      (1) fence, pavement, patio or swimming pool;

      (2) foundation, retaining wall or bulkhead; or

      (3) pier, wharf, or dock;

   c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

   d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

   e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

   f. (1) wear and tear, marring, deterioration;

      (2) inherent vice, latent defect, mechanical breakdown;

      (3) smog, rust, mold, wet or dry rot;

      (4) smoke from agricultural smudging or industrial operations;

      (5) release, discharge or dispersal of contaminants or pollutants;

      (6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

      (7) birds, vermin, rodents, insects or domestic animals.

   If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I – Exclusions.

Under Items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section 1 – Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

    This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

    This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

    This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

    This peril does not include loss caused by theft:

    a. committed by an **insured;**

    b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

    c. from that part of a **residence premises** rented by an **insured** to other than an **insured.**

    This peril does not include loss caused by theft that occurs off the **residence premises** of:

    a. property while at any other residence owned by, rented to, or occupied by an **insured,** except while an **insured** is temporarily living there. Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

    b. watercraft, including their furnishings, equipment and outboard motors; or

    c. trailers and campers.

10. **Falling Objects.**

    This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

    This peril does not include loss:

    a. to the system or appliance from which the water or steam escaped;

    b. caused by or resulting from freezing except as provided in the peril of freezing below; or

    c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises.**

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

    We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

    This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

    a. maintain heat in the building; or

    b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

    This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

    This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

17. **Volcanic Eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

   b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption, landslide, mudflow, earth sinking, rising, or shifting, unless direct loss by:

      (1) fire;

      (2) explosion; or

      (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;

      ensues and then we will pay only for the ensuing loss.

      This exclusion does not apply to loss by theft.

   c. **Water Damage,** meaning:

      (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

      (2) water which backs up through sewers or drains; or

      (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

      Direct loss by fire, explosion or theft resulting from water damage is covered.

   d. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises.** But, if a Peril Insured Against ensues on the **residence premises,** we will pay only for that ensuing loss.

   e. **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

   f. **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

   g. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I – Conditions.

   h. **Intentional Loss,** meaning any loss arising out of any act committed:

      (1) by or at the direction of an **insured;** and

      (2) with the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

   a. **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss:

   b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

   c. **Faulty, inadequate or defective:**

      (1) planning, zoning, development, surveying, siting;

      (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) materials used in repair, construction, renovation or remodeling; or

      (4) maintenance;

      of part or all of any property whether on or off the **residence premises.**

# SECTION I—CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

   a. give prompt notice to us or our agent;

   b. notify the police in case of loss by theft;

   c. notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

   d. (1) protect the property from further damage;

      (2) make reasonable and necessary repairs to protect the property; and

      (3) keep an accurate record of repair expenses;

   e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   f. as often as we reasonably require:

      (1) show the damaged property;

      (2) provide us with records and documents we request and permit us to make copies; and

      (3) submit to questions under oath and sign and swear to them;

   g. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

      (1) the time and cause of loss;

      (2) the interest of the **insured** and all others in the property involved and all liens on the property;

      (3) other insurance which may cover the loss;

      (4) changes in title or occupancy of the property during the term of the policy;

      (5) specifications of damaged buildings and detailed repair estimates;

      (6) the inventory of damaged personal property described in 2e above;

      (7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

      (8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) Personal property;

      (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

      (3) Structures that are not buildings;

      at actual cash value at the time of loss but not more than the amount required to repair or replace.

   b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

      (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

         (a) the limit of liability under this policy that applies to the building;

         (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

         (c) the necessary amount actually spent to repair or replace the damaged building.

Copyright, Insurance Services Office, Inc. 1984

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

  (a) the actual cash value of that part of the building damaged; or

  (b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

  (a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

  (b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

  (c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage unless:

  (a) actual repair or replacement is complete; or

  (b) the cost to repair or replace the damage is both:

    (i) less than 5% of the amount of insurance in this policy on the building; and

    (ii) less than $1000.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

a Pair or Set. In case of loss to a pair or set we may elect to:

  a. repair or replace any part to restore the pair or set to its value before the loss; or

  b. pay the difference between actual cash value of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

  a. pay its own appraiser; and

  b. bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

  a. reach an agreement with you;

  b. there is an entry of a final judgment; or

  c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an insured.

**12. Mortgage Clause.**

The word "mortgagee" includes trustee.

If a mortgage is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If the policy is cancelled or not renewed by us, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

**13. No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

**14. Nuclear Hazard Clause.**

a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**15. Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**16. Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

---

## SECTION II – LIABILITY COVERAGES

### COVERAGE E — Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

### COVERAGE F — Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except **residence employees**. As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**; or

2. to a person off the **insured location**, if the **bodily injury**:

   a. arises out of a condition on the **insured location** or the ways immediately adjoining;

   b. is caused by the activities of an **insured**;

   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or

   d. is caused by an animal owned by or in the care of an **insured**.

---

## SECTION II — EXCLUSIONS

1. **Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to **bodily injury** or **property damage**:

   a. which is expected or intended by the **insured**;

   b. arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured**.

      This exclusion does not apply to:

      (1) activities which are usual to non-**business** pursuits; or

      (2) the rental or holding for rental of an **insured location**:

         (a) on an occasional basis if used only as a residence;

         (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

         (c) in part, as an office, school, studio or private garage;

   c. arising out of the rendering of or failure to render professional services;

   d. arising out of a premises:

      (1) owned by an **insured**;

      (2) rented to an **insured**; or

      (3) rented to others by an **insured**;

      that is not an **insured location**;

   e. arising out of:

      (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **insured**;

      (2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or

      (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

      This exclusion does not apply to:

      (1) a trailer not towed by or carried on a motorized land conveyance.

      (2) a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

         (a) not owned by an **insured**; or

         (b) owned by an **insured** and on an **insured location**.

      (3) a motorized golf cart when used to play golf on a golf course.

      (4) a vehicle or conveyance not subject to motor vehicle registration which is:

         (a) used to service an **insured's** residence;

         (b) designed for assisting the handicapped; or

         (c) in dead storage on an **insured location**.

   f. arising out of:

      (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

      (2) the entrustment by an **insured** of a watercraft described below to any person; or

      (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

      Watercraft:

      (1) with inboard or inboard-outdrive motor power owned by an **insured**;

      (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured**;

---

   Copyright, Insurance Services Office, Inc. 1984

(3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured**; or

(4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured**. But, outboard motors of more than 25 total horsepower are covered for the policy period if:

(a) you acquire them prior to the policy period and:

(I) you declare them at policy inception; or

(II) your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors.

(b) you acquire them during the policy period.

This exclusion does not apply while the watercraft is stored.

g. arising out of:

(1) the ownership, maintenance, use, loading or unloading of an aircraft;

(2) the entrustment by an **insured** of an aircraft to any person; or

(3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

h. caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the residence employee's employment by an **insured**.

**2. Coverage E — Personal Liability,** does not apply to:

a. liability:

(1) for your share of any loss assessment charged against all members of an association, corporation or community of property owners;

(2) under any contract or agreement. However, this exclusion does not apply to written contracts:

(a) that directly relate to the ownership, maintenance or use of an **insured** location; or

(b) where the liability of others is assumed by the **insured** prior to an **occurrence**;

unless excluded in (1) above or elsewhere in this policy;

b. **property damage** to property owned by the **insured**;

c. **property damage** to property rented to, occupied or used by or in the care of the **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to any person eligible to receive any benefits:

(1) voluntarily provided; or

(2) required to be provided;

by the **insured** under any:

(1) workers' compensation law;

(2) non-occupational disability law; or

(3) occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy:

(1) is also an **insured** under a nuclear energy liability policy; or

(2) would be an **insured** under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

(1) American Nuclear Insurers;

(2) Mutual Atomic Energy Liability Underwriters;

(3) Nuclear Insurance Association of Canada;

or any of their successors; or

f. **bodily injury** to you or an **insured** within the meaning of part a. or b. of "**insured**" as defined.

Copyright, Insurance Services Office, Inc. 1984

3. **Coverage F—Medical Payments to Others**, does not apply to **bodily injury**:

a. to a **residence employee** if the **bodily injury**:

(1) occurs off the **insured location**; and

(2) does not arise out of or in the course of the **residence employee's** employment by an **insured**;

b. to any person eligible to receive benefits:

(1) voluntarily provided; or

(2) required to be provided;

under any:

(1) workers' compensation law;

(2) non-occupational disability law;

(3) occupational disease law;

c. from any:

(1) nuclear reaction;

(2) nuclear radiation; or

(3) radioactive contamination;

all whether controlled or uncontrolled or however caused; or

(4) any consequence of any of these.

d. to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

---

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

a. expenses we incur and costs taxed against an **insured** in any suit we defend;

b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit;

d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies;

e. prejudgment interest awarded against the **insured** on that part of the judgment we pay. If we make an offer to pay the applicable limit of liability, we will not pay any prejudgment interest based on that period of time after the offer.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.** We will pay, at replacement cost, up to $500 per **occurrence** for **property damage** to property of others caused by an **insured**.

We will not pay for **property damage**:

a. to the extent of any amount recoverable under Section I of this policy;

b. caused intentionally by an **insured** who is 13 years of age or older;

c. to property owned by an **insured**;

d. to property owned by or rented to a tenant of an **insured** or a resident in your household; or

e. arising out of:

(1) **business** pursuits;

(2) any act or omission in connection with a premises owned, rented or controlled by an **insured**, other than the **insured location**; or

(3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **insured**.

4. **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

a. each **occurrence** to which Section II of this policy would apply;

---

liability for a loss of a director/officer or trustee in the capacity as a director, officer or trustee, provided:

(1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and

(2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the residence premises.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Section II — Coverage E — Personal Liability Exclusion 2.a.(1) does not apply to this coverage.

## SECTION II—CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured.

Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition will not increase our limit of liability for any one occurrence.

3. **Duties After Loss.** In case of an accident or **occurrence**, the **insured** will perform the following duties that apply. You will help us by seeing that these duties are performed:

a. give written notice to us or our agent as soon as is practical, which sets forth:

(1) the identity of the policy and **insured**;

(2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

(3) names and addresses of any claimants and witnesses;

b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

c. at our request, help us:

(1) to make settlement;

(2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**;

(3) with the conduct of suits and attend hearings and trials;

(4) to secure and give evidence and obtain the attendance of witnesses;

d. under the coverage — Damage to Property of Others — submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the insured's control;

e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person—Coverage F—Medical Payments to Others.**

The injured person or someone acting for the injured person will:

a. give us written proof of claim, under oath if required, as soon as is practical; and

b. authorize us to obtain copies of medical reports and records.

The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim—Coverage F—Medical Payments to Others.** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the insured has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

8. **Other Insurance—Coverage E—Personal Liability.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

# SECTIONS I AND II — CONDITIONS

1. **Policy Period.** This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.** We do not provide coverage for an **insured** who has:

   a. intentionally concealed or misrepresented any material fact or circumstance; or

   b. made false statements or engaged in fraudulent conduct;

   relating to this insurance.

3. **Liberalization Clause.** If we adopt a revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions.**

   A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

5. **Cancellation.**

   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (b) if the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

   (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

   c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

   d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Non-Renewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

   Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. **insured** includes:

   (1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises;** and

   (2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Copyright, Insurance Services Office, Inc. 1984

## ALABAMA AMENDATORY ENDORSEMENT

**The Endorsements Contained In This State Amendatory Endorsement Apply To Your Homeowners Policy.**

CS 300
(Ed. 01/2002)
Alabama

### SPECIAL PROVISIONS

Throughout this policy, the following is added to any provision which uses the term actual cash value:

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

### DEFINITIONS

Under **DEFINITIONS**, items 2., 3., 5., 7., and 8., are deleted and replaced by the following and items 9., and 10., are added:

2. **"business"** means:

   a. a trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   b. any other activity engaged in for money or other compensation, except the following:

      (1) one or more activities, not described in (2) through (4) below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

      (2) volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

      (3) providing home day care services for which no compensation is received, other than mutual exchange of such services; or

      (4) the rendering of home day care services to a relative of an "insured".

3. **"insured"** means:

   a. you and residents of your household who are:

      (1) your relatives; or

      (2) other persons under the age of 21 and in the care of any person named above;

   b. a student enrolled in school full-time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

      (1) 24 and your relative; or

      (2) 21 and in your care or the care of a person described in a.(1). (Your relatives).

Under Section II, **"insured"** also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3.a. or 3.b. above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured**;

   d. with respect to any vehicle to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3.a. or 3.b. above; or

      (2) other persons using the vehicle on an **insured location** with your consent.

5. **"occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. bodily injury; or

   b. property damage.

7. **"residence employee"** means:

   a. An employee of an **insured**, or an employee leased to an **insured** by a labor leasing firm, under an agreement between an **insured** and the labor leasing firm, whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or

   b. One who performs similar duties elsewhere not related to the **business** of an **insured**

   A **"residence employee"** does not include a temporary employee who is furnished to an **insured** to substitute for a permanent **residence employee** on leave or to meet seasonal or short-term workload conditions.

This endorsement contains copyrighted material of the
Insurance Services Office, Inc., with its permission 1990 and 1999.

a. the one family dwelling where you reside;

b. the two family dwelling where you reside in at least one of the family units; or

c. that part of any other building where you reside; and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

9. "employee" means an employee of an insured or an employee leased to an insured by a labor leasing firm under an agreement between an insured and the labor leasing firm, whose duties are other than those performed by a residence employee.

10. "motor vehicle" means:

a. a self-propelled land or amphibious vehicle; or

b. any trailer or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in 10.a. above.

If the Farmers Personal Liability endorsement (HO-73) is made a part of this policy, item e. of Definition 2, "insured location", is deleted and replaced by the following:

e. vacant land owned by or rented to an insured;

## SECTION I—PROPERTY COVERAGES

COVERAGE B—Other Structures is deleted and replaced by the following:

### COVERAGE B—Other Structures

1. We cover other structures on the residence premises set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2. We do not cover:

a. land, including land on which the other structures are located;

b. other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

c. other structures from which any business is conducted; or

d. other structures used to store business property.

3. The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A. limit of liability.

Under COVERAGE C—Personal Property, the first two paragraphs are deleted and replaced by the following:

### Covered Property

We cover personal property owned or used by an insured while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

1. Others, who are not residents or regular occupants of the residence premises, while the property is on the part of the residence premises occupied by an insured; or

2. A guest, who is not a resident or regular occupant of the residence premises, or a residence employee, while the property is in any residence occupied by an insured.

### Limit for Property at Other Residences

Our limit of liability for personal property usually located at an insured's residence, other than the residence premises, is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

1. Moved from the residence premises because the residence premises is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

2. In a newly acquired principal residence for 30 days from the time you first begin to move the property there.

Under COVERAGE C—Personal Property, Special Limits of Liability, is deleted and replaced by the following:

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

2. $1,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

3. $1,000 on watercraft of all types, including their trailers, furnishings, equipment, and outboard engines or motors.

4. $1,000 on trailers or semitrailers not used with watercraft of all types.

5. $1,000 on grave markers.

6. $1,000 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

7. $2,000 for loss by theft of firearms and related equipment.

8. $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollow-ware, tea sets, trays and trophies made of silver, gold, platinum or pewter.

9. $2,500 on property, on the **residence premises**, used primarily for **business** purposes.

10. $500 on property, away from the **residence premises**, used primarily for **business** purposes. However, this limit does not apply to loss to electronic apparatus and other property described in 11. and 12. below.

11. $1,000 on electronic apparatus and accessories, while in or upon a **motor vehicle**, but only if the apparatus is equipped to be operated by power from the **motor vehicle's** electrical system while still capable of being operated by other power sources.

    Accessories include antennas, tapes, wires, records, discs, or other media that can be used with any apparatus described in this category 11.

12. $1,000 on electronic apparatus and accessories, used primarily for business while away from the **residence premises** and not in or upon a **motor vehicle**. The apparatus must be equipped to be operated by power from the **motor vehicle's** electrical system while still capable of being operated by other power sources.

    Accessories include antennas, tapes, wires, records, discs, or other media that can be used with any apparatus described in this category 12.

Under **COVERAGE C—Personal Property, Property Not Covered**, items 1, 3, 8, and 9 are deleted and replaced by the following and item 10 is added:

1. articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

3. **motor vehicles**:

    a. this includes:

    (1) their accessories, equipment and parts, or

    (2) electronic apparatus and accessories designed to be operated solely by power from the electrical system of the **motor vehicle**.

    Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described above.

    The exclusion of property described in 3.a.(1) and 3.a.(2) above applies only while such property is in or upon the **motor vehicle**.

    b. we do cover **motor vehicles** not required to be registered for use on public roads or property which are:

    (1) used solely to service an **insured's** residence; or

    (2) designed to assist the handicapped.

8. **business data**, including such data stored in:

    a. books of account, drawings or other paper records

    b. computers and related equipment, electronic data processing tapes, wires, records discs or other software media. However, we do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market.

9. credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in **SECTION I—PROPERTY. COVERAGES, ADDITIONAL COVERAGES 6.** Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.

10. water or steam.

**ADDITIONAL COVERAGES**

Under **ADDITIONAL COVERAGES**, items 1, 2, 7 and 8 are deleted and replaced by the following and items 9 and 10 are added:

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

    a. debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

    b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

    This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

    We will also pay your reasonable expense, up to $500 in the aggregate for any one loss, for the removal from the **residence premises** of:

    a. your tree felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

    b. a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

a.  damage(s) a covered structure; or

b.  does not damage a covered structure, but:

    (1)  block(s) a driveway on the **residence premises** which prevent(s) a **motor vehicle**, that is registered for road use on public roads or property, from entering or leaving the **residence premises**; or

    (2)  block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

2.  **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a.  does not increase the limit of liability that applies to the covered property;

b.  does not relieve you of your duties, in case of a loss to covered property, as set forth in Section I Condition 2.d.

7.  **Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the **residence premises**, by a corporation or association of property owners. The assessment must be made as a result of direct loss to the property, owned by all members collectively, of the type that would be covered by this policy if the property was owned by you, caused by a Peril Insured Against under Coverage A— Dwelling, other than:

a.  earthquake; or

b.  land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments.    We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Condition 1. Policy Period, under Sections I and II Conditions, does not apply to this coverage.

This coverage is additional insurance.

a.  With respect to this Additional Coverage:

    (1)  collapse means an abrupt falling down or caving in of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

    (2)  a building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

    (3)  a part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

    (4)  a building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b.  We insured for direct physical loss to covered property involving collapse of a building if the collapse was caused by one or more of the following:

    (1)  the Perils Insured Against named under Coverage C;

    (2)  decay that is hidden from view, unless the presence of such decay is known to an **insured** prior to collapse;

    (3)  insect or vermin damage that is hidden from view, unless the presence of such damage is known to an **insured** prior to collapse;

    (4)  weight of contents, equipment, animals or people;

    (5)  weight of rain which collects on a roof; or

    (6)  use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

c.  Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under b.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

d.  This coverage does not increase the limit of liability that applies to the damaged covered property.

9.  **Landlord's Furnishings.** We will pay up to $1,500 for your appliances, carpeting and other household furnishings, in each apartment on the **residence premises** regularly rented or held for rental to others by an **insured**, for loss caused by a Peril Insured Against in Coverage C, other than theft.

This limit is the most we will pay in any one loss, regardless of the number of appliances, carpeting or other household furnishings involved in the loss. This coverage does not increase the limit of liability applying to the damaged property.

10. **Ordinance or Law**

a. You may use up to 10% of the limit of liability that applies to Coverage A (in form HO-4, you may use up to 10% of the limit of liability that applies to Building Additions and Alterations) for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) the construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) the demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) the remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in 10.a. above.

c. We do not cover:

(1) the loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) the costs to comply with any ordinance or law which requires any **insured** or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**This coverage is additional insurance.**

## SECTION I—PERILS INSURED AGAINST

Under **SECTION I—PERILS INSURED AGAINST, COVERAGE A—DWELLING and COVERAGE B—OTHER STRUCTURES**, items 2.a., 2.b., 2.d., 2.e., 2.f.(2), 2.f.(3), 2.f.(5), 2.f.(6), 2.f.(7), and 3. are deleted from Forms HO-3 and HO-5 and replaced by the following:

2. caused by:

a. freezing of a plumbing, heating or air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage, or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

(1) maintain heat in the building; or

(2) shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, or downspout or similar fixtures or equipment.

b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) fence, pavement, patio, or swimming pool;

(2) footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

(3) retaining wall or bulkhead that does not support all or part of a building or other structure; or

(4) pier, wharf or dock;

d. vandalism and malicious mischief or breakage of glass and safety glazing materials, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

e. mold, fungus or wet rot. However, we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within:

(1) a plumbing, heating or air conditioning or automatic fire protective sprinkler system, or a household appliance, on the **residence premises**; or

(2) a storm drain, or water, steam or sewer pipes, off the **residence premises**.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment; or

f. (2) mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

(3) smog, rust or other corrosion, or dry rot;

(5) discharge, dispersal, seepage, migration, release, or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Waste includes materials to be recycled, reconditioned or reclaimed;

(6) settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

(7) birds, vermin, rodents, insects; or animals owned or kept by an **insured**.

Exception to item 2.f.: unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of water or steam from within a:

(1) storm drain, or water, steam or sewer pipe, off the **residence premises**; or

(2) plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the **residence premises**. This includes the cost to tear out and replace any part of a building, or other structure, on the **residence premises**, but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the **residence premises**.

which this water or steam escapes.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section I—Exclusions c.(1) and c.(3) that apply to surface water and water below the surface of the ground do not apply to loss by water covered under 2.e. and 2.f. above.

3. excluded under Section I—Exclusions.

Under 1 and 2 above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

Under **SECTION I—PERILS INSURED AGAINST**, items 2 and 6 are deleted from Form HO-6 and replaced by the following:

2. **Windstorm or Hail.**

This peril does not include loss to the inside of a building or the property contained in a building caused by rain, snow, sleet, sand, or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening. This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

6. **Vehicles**

This peril does not include loss to a fence, driveway or walk caused by a vehicle owned or operated by a resident of the **residence premises**.

Under **SECTION I—PERILS INSURED AGAINST**, item 7 is deleted from Forms HO-2, HO-4 and HO-6 and from **COVERAGE C—PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

7. **Smoke**, meaning sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment. This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

Under **SECTION I—PERILS INSURED AGAINST**, item 9 is deleted from Forms HO-2, HO-4 and HO-6 and from **COVERAGE C—PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

9. **Theft**, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

This peril does not include loss caused by theft:

a. committed by an **insured**;

b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

c. from a part or a residence premises rented by an **insured** to someone other than another **insured**; or

d. that occurs off the **residence premises** of:

(1) property while at any other residence owned by, rented to, or occupied by an **insured** except while an **insured** is temporarily living there. Property of an **insured** who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 60 days immediately before the loss;

(2) watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(3) trailers, semitrailers and campers.

Under **SECTION I—PERILS INSURED AGAINST** items 11 is deleted from Form HO-6 and replaced by the following:

11. **Falling Objects.**

This peril does not include loss to the inside of a building or property contained in the building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

Under **SECTION I—PERILS INSURED AGAINST.** item 12 is deleted from Forms HO-2 and HO-6 and replaced by the following:

12. **Weight of ice, snow or sleet** which causes damage to a building or property contained in the building.

This peril does not include loss to an awning, fence, patio, pavement, swimming pool, footing, foundation, wall, any other structure or device that supports all or part of a building or other structure, retaining wall or bulkhead that does not support all or part of a building or other structure, pier, wharf or dock.

Under **SECTION I—PERILS INSURED AGAINST**, item 12 is deleted from **COVERAGE C—PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

12. **Accidental discharge or overflow of water or steam** meaning accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing except as provided in the Peril Insured Against of Freezing below;

c. on the **residence premises** caused by accidental charge or overflow which occurs off the **residence premises**; or

d. caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings or a surface.

In this peril a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Section I—Exclusions c.(1) and c.(3) that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

Under **SECTION I—PERILS INSURED AGAINST**, item 13 is deleted from Forms HO-2, HO-4 and HO-8 and replaced by the following:

13. **Accidental discharge or overflow of water or steam** meaning accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. In Forms HO-2 and HO-6, this includes the cost to tear out and replace any part of a building or other structure on the **residence premises**, which is covered under Coverage A, but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to the building on the **residence premises**.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing except as provided in the Peril Insured Against of Freezing below;

c. on the **residence premises** caused by accidental charge or overflow which occurs off the **residence premises**; or

d. caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings or a surface.

In Forms HO-2 and HO-6, this peril does not include loss on the **residence premises**, if the unit has been vacant for more than 30 consecutive days immediately before the loss. A unit being constructed is not considered vacant.

In this peril a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

 This endorsement contains copyrighted material of the Insurance Services Office, Inc., with its permission 1990 and 1999.

surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

Under **SECTION I—PERILS INSURED AGAINST**, item 13 is deleted from **COVERAGE C— PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

13. **Sudden and Accidental Tearing Apart, Cracking, Burning or Bulging** meaning sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

Under SECTION I—PERILS INSURED AGAINST item 14 is deleted from Forms HO-2, HO-4 and HO-6 and replaced by the following:

14. **Sudden and Accidental Tearing Apart, Cracking, Burning or Bulging** meaning sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

Under **SECTION I—PERILS INSURED AGAINST**, item 14 is deleted from **COVERAGE C— PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

14. **Freezing** meaning freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

   a.  maintain heat in the building; or

   b.  shut off the water supply and drain all systems and appliances of water.

   However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

   In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Under SECTION I—PERILS INSURED AGAINST, item 15 is deleted from Forms HO-2, HO-4 and HO-6 and replaced by the following:

conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

a.  maintain heat in the building; or

b.  shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Under **SECTION I—PERILS INSURED AGAINST**, item 15 is deleted from **COVERAGE C—PERSONAL PROPERTY** from Forms HO-3 and HO-5 and replaced by the following:

15. **Sudden and Accidental Damage from Artificially Generated Electrical Current**

   This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

Under **SECTION I—PERILS INSURED AGAINST**, item 16 is deleted from Forms HO-2, HO-4 and HO-6 and replaced by the following:

16. **Sudden and Accidental Damage from Artificially Generated Electrical Current**

   This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**SECTION I—CONDITIONS**

Under **3. Loss Settlement** in Forms HO-2 and HO-3 the first paragraph, the first paragraph of item b., and items b.(1) and b.(4) are deleted and replaced by the following:

3.  **Loss Settlement.** In this Condition 3., the terms "costs to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in 10. Ordinance of Law under **Section I— ADDITIONAL COVERAGES.** Covered property losses are settled as follows:

   b.  Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

      (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair

or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

  (a) the limit of liability under this policy that applies to the building;

  (b) the replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

  (c) the necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in b. above is limited to the cost which would have been incurred if the building had been built at the original premises.

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 3.b.(1) and 3.b.(2) above.

However, if the cost to repair or replace the damage is both:

  (a) less than 5% of the amount of insurance in this policy on the building; and

  (b) less than $2,500;

we will settle the loss as noted in 3.b.(1) and 3.b.(2) above whether or not actual repair or replacement is complete.

Under **3. Loss Settlement** in Form HO-6 the first paragraph is deleted and replaced by the following:

3. **Loss Settlement.** In this Condition 3., the terms "repaired" or "replaced" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in 10. Ordinance of Law under Section I–ADDITIONAL COVERAGES. Covered property losses are settled as follows:

## SECTION II—LIABILITY COVERAGES

Under **Coverage E, Personal Liability**, item 1. is deleted and replaced by the following:

1. pay up to our limit of liability for the damages for which an **insured** is legally liable. Damages include prejudgment interest awarded against an **insured**; and

## SECTION II EXCLUSIONS

Under item 1. **Coverage E—Personal Liability** and **Coverage F—Medical Payments to Others**, items a., b., e., f., and g. are deleted and replaced by the

following and item j. is added in all Forms and Endorsement HO-73:

  a. which is expected or intended by an **insured** even if the resulting **bodily injury** or **property damage** is:

    (1) of a different kind, quality or degree than initially expected or intended; or

    (2) sustained by a different person, entity, real or personal property, than initially expected or intended.

However, this exclusion does not apply to **bodily injury** resulting from the use of reasonable force by an **insured** to protect persons or property;

  b. arising out of or in connection with a **business** conducted from an **insured location** or engaged in by an **insured**, whether or not the **business** is owned or operated by an **insured** or employs an **insured**. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the **business**. This exclusion does not apply to:

    (1) the rental or holding for rental of an **insured location**:

      (a) on an occasional basis if used only as residence;

      (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

      (c) in part, as an office, school, studio or private garage; and

    (2) an **insured** under the age of 21 years involved in a part-time or occasional, self-employed **business** with no employees;

  e. arising out of:

    (1) ownership of a **motor vehicle** by an **insured**;

    (2) maintenance, occupancy, operation, use, loading or unloading of **motor vehicles** by any person;

    (3) entrustment of a **motor vehicle** by an **insured** to any person;

    (4) failure to supervise or negligent supervision of any person involving a **motor vehicle** by an **insured**; or

    (5) vicarious liability, whether or not imposed by law, for the actions of a child or minor using a **motor vehicle**;

if, at the time and place of an **occurrence**, the involved **motor vehicle**:

(1) is registered for use on public roads or property;

(2) is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the **occurrence**; or

(3) is being:

   (a) operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

   (b) rented to others;

   (c) used to carry persons or cargo for a charge; or

   (d) used for any **business** purpose except for a motorized golf cart while on a golfing facility.

If Exclusion e. does not apply, there is still no coverage for **bodily injury** or **property damage** unless the **motor vehicle** is:

(1) in dead storage on an **insured location** ;

(2) used solely to service an **insured's** residence;

(3) designed to assist the handicapped and, at the time of an **occurrence**, it is:

   (a) being used to assist a handicapped person, or

   (b) parked on an **insured location** ;

(4) designed for recreational use off public roads and:

   (a) not owned by an **insured**; or

   (b) owned by an **insured** provided the **occurrence** takes place on an **insured location** as defined in Definitions 4.a., 4.b., 4.d., 4.e., or 4.h.; or

(5) a motorized golf cart, that at the time of an **occurrence**, is within the legal boundaries of a golfing facility and is parked or stored there, or being used by an **insured** to:

   (a) play the game of golf or for other recreational or leisure activities allowed by the facility;

   (b) travel to or from an area where **motor vehicles** or golf carts are parked or stored; or

   (c) cross public roads at designed points to access other parts of the golfing facility.

f. arising out of the:

(1) ownership of a watercraft by an **insured**;

(2) maintenance, occupancy, operation, use, loading or unloading of watercraft by any person;

(3) entrustment of a watercraft by an **insured** to any person;

(4) failure to supervise or negligent supervision of any person involving a watercraft by an **insured** or;

(5) vicarious liability, whether or not imposed by law, for the actions of a child or minor using a watercraft;

if, at the time and place of an **occurrence**, the involved watercraft is:

(1) operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

(2) rented to others;

(3) used to carry persons or cargo for a charge; or

(4) used for any **business** purpose;

If Exclusion f. does not apply, there is still no coverage for **bodily injury** or **property damage** unless the watercraft:

(1) is stored;

(2) is a sailing vessel, with or without auxiliary power, that is:

   (a) less than 26 feet in overall length; or

   (b) 26 feet or more in overall length and not owned by or rented to an **insured**;

(3) is not a sailing vessel and is powered by:

   (a) an inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

      (i) 50 horsepower or less and not owned by an **insured**; or

      (ii) more than 50 horsepower and not owned by or rented to an **insured; or**

   (b) one or more outboard engines or motors with:

      (i) 25 total horsepower or less;

      (ii) more than 25 horsepower if the outboard engine or motor is not owned by an **insured**;

      (iii) more than 25 horsepower if the outboard engine or motor is owned by an **insured** who acquired it during the policy period; or

      (iv) more than 25 horsepower if the outboard engine or motor is owned by an **insured** who acquired it before the policy period, but only if:

This endorsement contains copyrighted material of the Insurance Services Office, Inc., with its permission 1990 and 1999.

(1) you declare them at policy
inception; or

(2) your intent to insure them is
reported to us in writing within 45
days after you acquire them.

The coverages in (iii) and (iv) above apply
for the policy period.

Horsepower means the maximum power
rating assigned to the engine or motor by the
manufacturer.

Watercraft means a craft principally designed to
be propelled on or in water by wind, engine power
or electric motor.

g. arising out of the:

(1) ownership of an aircraft by an **insured**;

(2) maintenance, occupancy, operation, use,
loading or unloading of aircraft by any person;

(3) entrustment of an aircraft by an **insured** to
any person;

(4) failure to supervise or negligent supervision of
any person involving an aircraft by an
**insured**; or

(5) vicarious liability, whether or not imposed by
law, for the actions of a child or minor using
an aircraft.

Aircraft means any contrivance used or designed
for flight except model or hobby aircraft not used
or designed to carry people or cargo.

i. arising out of the use, sale, manufacture, delivery,
transfer or possession by any person of a
Controlled Substance as defined by the Federal
Food and Drug Law at 21 U.S.C.A. Sections 811
and 812. Controlled substances include but are
not limited to cocaine, LSD, marijuana and all
narcotic drugs. However, this exclusion does not
apply to the legitimate use of prescription drugs by
a person following the orders of a licensed
physician.

Under item **2. Coverage E—Personal Liability**, items
a.(1), b., and f. are deleted and replaced by the
following in all Forms and Endorsement HO-73:

a.(1)  for any loss assessment charged against you
as a member of an association, corporation or
community of property owners, except as
provided in item 4. Loss Assessment under
Section II--Additional Coverages.

b.  **property damage** to property owned by an
**insured.**   This includes costs or expenses
incurred by an **insured** or others to repair,
replace, enhance, restore or maintain such
property to prevent injury to a person or damage
to property of others, whether on or away from
an **insured location**;

**bodily injury** to you or an **insured** as defined under
Definitions 3.a. or 3.b.  This exclusion applies to any
claim made or suit brought against you or an **insured**
to repay or share damages with another person who
may be obligated to pay damages because of **bodily
injury** to an **insured.**

## SECTION II—ADDITIONAL COVERAGES

Under item **1. Claim Expenses**, item c. is deleted and
replaced by the following and item e. is deleted.

c.  reasonable expenses incurred by an **insured** at our
request, including actual loss of earnings (but not loss
of other income) up to $200 per day, for assisting us in
the investigation or defense of a claim or suit; and

Under **3. Damage to Property of Others**, items e.(1) and
e.(3) are deleted and replaced by the following:

(1)  a **business** engaged in by an **insured** ;

(3)  the ownership, maintenance, occupancy, operation,
use, loading or unloading of aircraft, watercraft or
**motor vehicles.**

This exclusion e.(3) does not apply to a **motor vehicle**
that:

(a)  is designed for recreational use off public roads;

(b)  is not owned by an **insured**; and

(c)  at the time of the **occurrence**, is not required by
law, or regulation issued by a government
agency, to have been registered for it to be used
on public roads or property.

Item **4. Loss Assessment** is deleted and replaced by the
following:

4.  **Loss Assessment.** We will pay up to $1,000 for your
share of loss assessment charged during the policy
period against you by a corporation or association of
property owners, when the assessment is made as a
result of:

a.  **bodily injury or property damage** not excluded
under Section II of this policy; or

b.  liability for an act of a director, officer or trustee in
the capacity as a director, officer or trustee,
provided:

(1)  the director, officer or trustee is elected by the
members of a corporation or association of
property owners; and

(2)  the director, officer or trustee serves without
deriving any income from the exercise of
duties which are solely on behalf of a
corporation or association of property owners.

This coverage applies only to loss assessments charged
against you as owner or tenant of the **resident premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

    a.  one accident, including continuous or repeated exposure to substantially the same general harmful condition; or

    b.  a covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1.  Section II—Coverage E—Personal Liability Exclusion 2.a.(1);

2.  Condition 1. Policy Period. Under Sections I and II Conditions.

## SECTION II—CONDITIONS

Item **1. Limit of Liability**, is deleted and replaced by the following:

1.  **Limit of Liability.**  Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence. Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

Under Item **3. Duties After Loss**, the first paragraph is deleted and replaced by the following:

3.  **Duties After Loss.** In case of an **occurrence** you or another **insured** will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

Item **6. Suit Against Us** is deleted and replaced by the following:

6.  **Suit Against Us.**

    (a)  No action can be brought against us unless there has been full compliance with all of the terms of this Section II.

    (b)  No one will have the right to join us as a party to any action against an **insured.**

    (c)  Also, no action with respect to Coverage E can be brought against us until the obligation of such **insured** has been determined by final judgment or agreement signed by us.

## SECTION I AND II—CONDITIONS

Item **2. Concealment or Fraud**, is deleted and replaced by the following:

2.  **Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, an **insured** has:

    a.  intentionally concealed or misrepresented any material fact or circumstance;

    b.  engaged in fraudulent conduct; or

    c.  made false statements;

    relating to this insurance.

Item **3. Liberalization Clause** is deleted and replaced by the following:

3.  **Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations. This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadening and restrictions in coverage, whether that general program revision is implemented through introduction of a subsequent edition of our policy, or an amendatory endorsement.

Item **10. Our Right To Recompute Premium** is added:

10. **Our Right To Recompute Premium.** We established the premium for this policy based on the statements you made in the application for insurance. We have the right to recompute the premium if we later obtain information which affects the premium we charged.

### All other provisions of this policy apply.

SUPPLEMENTAL PROVISIONS

## SECTION I—EXCLUSIONS

In all forms except forms HO-3 and HO-5, under Section I—Exclusions, the first paragraph and items 1., 2., 3., 4., 5., and 8 are deleted and replaced by the following, and item 9. is added:

We do not insure for loss caused directly or indirectly by any of the following, or which would not have occurred in the absence of one or more of the following excluded events. Such loss is excluded regardless of the cause of the excluded event; other causes of the loss; or any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

1.  **Ordinance or Law**, meaning any ordinance or law:

    a.  requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This exclusion 1.a. does not apply to the amount of coverage that may be provided for in **Section I—Property Coverages**, item 10. **Additional Coverages;**

    b.  the requirements of which result in a loss in value to property; or

    c.  requiring any **insured** or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

    Pollution means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

    This exclusion 1.a. applies whether or not the property has been physically damaged.

2.  **Earth Movement** means:

    a.  earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

    b.  landslide, mudslide, or mudflow;

    c.  subsidence or sinkhole; or

    d.  any other earth movement including earth sinking, rising or shifting;

    e.  Earth pressures;

caused by or resulting from human or animal forces or any act of nature unless direct loss by fire, explosion or breakage of glass or safety glazing material, which is part of a building, storm door or storm window, ensues and then we will pay only for the ensuing loss.

This exclusion 1.b. does not apply to loss by theft.

3.  **Water Damage** means:

    a.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

    b.  water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

    c.  water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

    caused by or resulting from human or animal forces or any act of nature.

    Direct loss by fire, explosion or theft resulting from water damage is covered.

4.  **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the **residence premises**. But if the failure results in a loss, from a Peril Insured Against on the **residence premises**, we will pay for the loss caused by that peril.

5.  **Neglect**, meaning neglect of an **insured** to use all reasonable means to save and preserve property at and after the time of loss.

8.  **Intentional Loss** meaning any loss arising out of any act an **insured** commits or conspires to commit with the intent to cause a loss.

    In the event of such loss, **no insured** is entitled to coverage, even **insureds** who did not commit or conspire to commit the act causing the loss.

9.  **Governmental Action** meaning the destruction, confiscation or seizure of property described in Coverage A, B or C by order of any governmental or public authority.

    This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

In forms HO-3 and HO-5, under **Section I—Exclusions**, the first paragraph of item1., items 1.a., 1.b., 1.c., 1.d., 1.e., 1.h. and the first paragraph of item 2 are deleted and replaced by the following; and item 1.i. is added:

1. We do not insure for loss caused directly or indirectly by any of the following, or which would not have occurred in the absence of one or more of the following excluded events. Such loss is excluded regardless of the cause of the excluded event; other causes of the loss; or any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

    a. **Ordinance or Law**, meaning any ordinance or law:

        (1) requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This exclusion 1.a.(1) does not apply to the amount of coverage that may be provided for in **Section I–Property Coverages**, item10. **Additional Coverages;**

        (2) the requirements of which result in a loss in value to property; or

        (3) requiring any **insured** or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

        Pollution means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

        This exclusion 1.a. applies whether or not the property has been physically damaged.

    b. **Earth Movement** means:

        (1) earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

        (2) landslide, mudslide, or mudflow;

        (3) subsidence or sinkhole; or

        (4) any other earth movement including earth sinking, rising or shifting;

        (5) Earth Pressures;

        caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the ensuing loss.

This exclusion 1.b. does not apply to loss by theft.

    c. **Water Damage** means:

        (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

        (2) water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

        (3) water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

        caused by or resulting from human or animal forces or any act of nature.

        Direct loss by fire, explosion or theft resulting from water damage is covered.

    d. **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the **residence premises**. But if the failure results in a loss, from a Peril Insured Against on the **residence premises**, we will pay for the loss caused by that peril.

    e. **Neglect**, meaning neglect of an **insured** to use all reasonable means to save and preserve property at and after the time of loss.

    h. **Intentional Loss** meaning any loss arising out of any act an **insured** commits or conspires to commit with the intent to cause a loss.

        In the event of such loss, no **insured** is entitled to coverage, even **insureds** who did not commit or conspire to commit the act causing the loss.

    i. **Governmental Action** meaning the destruction, confiscation or seizure of property described in Coverage A, B or C by order of any governmental or public authority.

        This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

## SECTION I – CONDITIONS

Under **SECTION I–CONDITIONS**, items 1., the first paragraph of item 2., 2.a., 2.f.(3), the first paragraph of 6., 7., 8. and 12. are deleted and replaced by the following and item 2.h. is added.

This endorsement contains copyrighted material of the Insurance Services Office, Inc., with its permission 1990 and 1999.

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to an **insured** for more than the amount of such **insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an **insured** seeking coverage, or a representative of either:

   a. give immediate notice to us or our agent.

   f. (3) submit to examinations under oath, while not in the presence of any other **insured**, and sign the same.

   h. cooperate with us in the investigation of a claim;

6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

7. **Other Insurance and Service Agreement.** If a loss covered by this policy is also covered by:

   a. other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

   b. a service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan,

home warranty or other similar service warranty agreement, even if it is characterized as insurance.

8. **Suit Against Us.** No action can be brought by any insured or mortgagee unless there has been full compliance with all terms under Section I of this policy and the action is started within one year after the date of loss.

12. **Mortgagee Clause.** The word "mortgagee" includes trustee.

   If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgage. A mortgagee making claim under this policy is subject to all conditions of the policy relating to investigation, proof and payment of loss.

   If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

   a. notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   b. pays any premium due under this policy on demand if you have neglected to pay the premium; and

   c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to comply to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

   If the policy is cancelled or not renewed by us, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

   If we pay the mortgagee, and we deny payment to you or the policy is not payable to you by its terms:

   a. we are subrogated to all the rights of the mortgages granted under the mortgage on the property; or

   b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgages claim.

All other provisions of this policy apply.

HO 322
(Ed. 01/2002)

## NO SECTION II—LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## LIMITED SECTION I—PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

If an **insured** regularly provides home day care services to person or persons other than the **insureds** and receives monetary or other compensation for such services, that enterprise is a **business**. Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an **insured** to a relative of an **insured** is not considered a **business**.

Therefore, with respect to a home day care enterprise which is considered to be a **business** this policy:

1. does not provide Section II—Liability Coverages because a **business** of an **insured** is excluded under exclusion 1.b.(1) of Section II—Exclusions;

2. does not provide Section I—Coverage B coverage where other structures are used in whole or in part for **business**;

3. limits coverage for property used on the **residence premises** for the home day care enterprise to $2500, because Coverage C—Special Limits of Liability item 9 imposes that limit on **business** property on the **residence premises**;

4. limits coverage for property used off the **residence premises** for the home day care enterprise to $500, because Coverage C—Special Limits of Liability item 10 imposes that limit on **business** property off the **residence premises**.

This Endorsement Does Not Constitute A Reduction Of Coverage.

CS 101
(Ed. 01/2002)

## COMMUNICABLE DISEASE AND SEXUAL MISCONDUCT EXCLUSION

### Section I—Exclusion

The following exclusion is added to Coverage E—Personal Liability and Coverage F—Medical Payments. This policy does not cover and will not pay for **bodily injury** or **property damage** which arises out of:

1. the transmission of a Communicable Disease by an **insured**;

2. sexual misconduct, sexual molestation, corporal punishment or physical or mental abuse by an **insured** whether or not the acts are in violation of penal or criminal statutes.

This endorsement contains copyrighted material of the Insurance Services Office, Inc., with its permission 1990 and 1999.

## LOSS PREVENTION CREDIT ENDORSEMENT

For a premium credit, we acknowledge the following installation and/or conditions where applicable and agreed by you.

1. You agree to maintain in working order any alarm or sprinkler system installed for which you are receiving premium credit. You agree to notify us promptly of any change to or removal of such systems.

2. You agree to notify us promptly if any member of the household has smoked cigarettes, cigars or pipes within the past 12 months and you are receiving a non-smoker premium credit.

CS 216 (Ed. 01/90)

This endorsement contains copyrighted material of the Insurance Services Office, Inc. with its permission 1987.

# EVIDENTIARY SUBMISSION

# 4

# EXHIBIT "C"



**Cotton States INSURANCE. AND AFFILIATES**

1701 N. Towanda Avenue
Bloomington, IL 61702
www.cottonstatesinsurance.com

January 23, 2007



Mr. Michael Gosdin
Mr. Justin Gosdin
9100 County Road 258
Roanoke, AL 36274

RE:  *Leslie Miller as Mother and Next Friend of Jonathon Miller, a minor vs. Michael Gosdin
and Justin Gosdin, a minor.* Case No. CV06-291 in the Circuit Court of Chamber County,
State of Alabama.

|                  |                     |
|------------------|---------------------|
| Our Claim No.:   | 001302000041300     |
| Insured Name:    | Charles W. Gosdin   |
| Policy No.:      | AHO-3355540         |
| Date of Loss:    | April 16, 2006      |

## NOTICE OF DEFENSE UNDER
## RESERVATION OF RIGHTS

Dear Michael and Justin Gosdin:

The Complaint filed by Leslie Miller as Mother and Next Friend of Jonathon Miller, a Minor, has
been forwarded to this office for consideration whether coverage and defense of the lawsuit could
be afforded under the policy of insurance issued to Charles W. Gosdin, Policy Number
AHO3355540.

Cotton States Mutual Insurance Company hereby informs you of our reservation of rights to file an
action for declaratory judgment asserting that we have no duty to indemnify for any damages
resulting from the alleged negligence as stated in the above referenced Complaint.

On the date alleged in the Complaint, the homeowner's insurance policy issued to Charles W.
Gosdin provided the following language:

Home Office:  Cotton States Mutual Insurance Company, Shield Insurance Company
244 Perimeter Center Parkway N.E., Atlanta, Georgia 30346

Home Office:  COUNTRY Casualty Insurance Company
1701 N. Towanda Avenue, Bloomington, Illinois 61701

RE: 001302000041300
Page 2 of 4
January 23, 2007

### Section II – Liability Coverages
### Coverage E – Personal Liability

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1.   pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2.   provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

\* \* \* \* \*

### Section II – Exclusions
1.   **Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to **bodily injury** or **property damage**:

\* \* \*

d.   arising out of a premises:
(1)   owned by an **insured**;
(2)   rented to an **insured**; or
(3)   rented to others by an **insured**;
that is not an **insured location**;

\* \* \* \* \*

### Definitions:

In this policy, "you" and "your" refer to the "named insured" shown in the Declaration and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

\* \* \*

RE: 001302000041300
Page 3 of 4
January 23, 2007

3. **"insured"** means you and residents of your household who are:

    a.    your relatives; or

    b.    other persons under the age of 21 and in the care of any person named above.

4. **"insured location"** means:

    a.    the **residence premises;**

    b.    the part of other premises, other structures and grounds used by you as a residence and;

        (1)    which is shown in the Declarations; or

        (2)    which is acquired by you during the policy period for your use as a residence;

    c.    any premises used by you in connection with a premises in 4a or 4b above;

    d.    any part of a premises:

        (1)    not owned by an **insured;** and

        (2)    where an **insured** is temporarily residing;

    e.    vacant land, other than farm land, owned by or rented to an **insured;**

    f.    land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured;**

    g.    individual or family cemetery plots or burial vaults of an **insured;** or

    h.    any part of a premises occasionally rented to an insured for other than business use.

Our investigation to date reveals that you may not have been a resident of Charles W. Gosdin's household at the time of this occurrence. Our investigation further reveals that this occurrence may have arisen out of a premises that is not an insured location. If this is the case, coverage would not be afforded under Charles W. Gosdin's homeowner's policy Number AHO3355540.

As you are aware, Cotton States Mutual Insurance Company will provide you with legal counsel for the defense of this lawsuit and will pay said counsel a reasonable sum for their services . However, it shall be clearly understood that by providing you with counsel for the defense of this lawsuit, Cotton States Mutual Insurance Company shall not be deemed nor held to have waived its right to deny liability under the policy of insurance to which we have retained counsel and that such disclaimer of liability can be made by Cotton States Mutual Insurance Company at any time hereafter, for the reasons stated in this letter, or any other reason either during the pendency of this lawsuit or after the termination thereof.

RE: 001302000041300
Page 4 of 4
January 23, 2007

Should you have any questions or have additional information you would like me to consider, please feel free to contact me.

Sincerely,
Cotton States

Kristi G. Lewis
Claims Attorney I
Phone:  (309) 821-2266
Fax:    (309) 820-4527

KGL/cfg

# EVIDENTIARY SUBMISSION

# 5

IN THE UNITED STATES DISTRICT COURT OF ALABAMA
MIDDLE DISTRICT
EASTERN DIVISION

COTTON STATES MUTUAL                )
    INSURANCE CO.

        PLAINTIFF                            )

VS.                                              )              CASE NO. 3:07 CV 422-WHA

MICHAEL GOSDIN and J.G., a minor)

        DEFENDANTS                        )

## ANSWER

Defendants Michael Gosdin and J. G., a minor, respond to the allegations of the complaint as follows:

1.    Denied.

2.    Admitted that the Plaintiff engages in insurance business in the state of Alabama.  The Defendants are without sufficient information to admit or deny the remaining allegations of paragraph 2.  Therefore, they are denied.

3.    Admitted that the Defendants are residents of the State of Alabama. The remaining allegations are denied.

4.    Denied.

5.    Admitted that the lawsuit was filed.

6.    Except as to the redactions, admitted.

7.    Admitted.

8.    Defendants believe this allegation to be true but are unsure. Therefore, it is denied.

9.    The Defendants are without sufficient information to admit or deny the allegations of paragraph 9. Therefore, they are denied.

10.    Upon information and belief, admitted.

11.    Admitted that the Plaintiff began providing a defense. The remaining allegations are denied.

12.    Denied.

The Defendants deny that the Plaintiff is entitled to the relief sought but instead assert that the Plaintiff is obligated to provide a defense to the Defendants and to indemnify them from any judgment or liability in this case.

Additionally, defendants Michael Gosdin and J. G. assert the following affirmative defenses:

    1.    Waiver
    2.    Estoppel

Chad Lee    LEE043
Attorney for Defendants
Post Office Box 966
Wedowee, Alabama 36278
256-357-4800

# CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing party in the foregoing matter with a copy of this pleading by hand delivery or by faxing or by depositing a copy of the same in the United States Mail, in an envelope with adequate postage prepaid thereon and properly addressed to him.

George P. Ford
Ford, Howard & Cornett, P.C.
P O Box 388
Gadsden, Alabama 35902

This 5th day of June, 2007.

Chad Lee

# EVIDENTIARY SUBMISSION

## 6

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

ORIGINAL

CASE NUMBER:    3:07CV422-WHA

COTTON STATES MUTUAL INS. COMPANY,

Plaintiff,

vs.

MICHAEL GOSDIN and J.G., a minor,

Defendants.

DEPOSITION OF MICHAEL GOSDIN

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED
by and between the parties through their
respective counsel, that the deposition
of MICHAEL GOSDIN may be taken before
ELIZABETH LAW, Commissioner, at 11 Main
Street South, Wedowee, Alabama, on the
24th day of January 2008.

IT IS FURTHER STIPULATED

# FREEDOM COURT REPORTING

1   AND AGREED that the signature to and the

2   reading of the deposition by the witness

3   is waived, the deposition to have the

4   same force and effect as if full

5   compliance had been had with all laws

6   and rules of Court relating to the

7   taking of depositions.

8           IT IS FURTHER STIPULATED

9   AND AGREED that it shall not be

10  necessary for any objections to be made

11  by counsel to any questions except as to

12  form or leading questions, and that

13  counsel for the parties may make

14  objections and assign grounds at the

15  time of the trial, or at the time said

16  deposition is ordered in evidence, or

17  prior thereto.

18          IT IS FURTHER STIPULATED

19  AND AGREED that the notice of filing of

20  the deposition by the Commissioner is

21  waived.

22

23

# FREEDOM COURT REPORTING

```
 1                    APPEARANCES
 2            FORD, HOWARD & CORNETT, by
 3    Mr. George P. Ford, 140 South Ninth
 4    Street, Gadsden, Alabama, 35901,
 5    appearing on behalf of the Plaintiff.
 6            CHAD LEE, Attorney at Law,
 7    11 Main Street South, Wedowee, Alabama,
 8    36278, appearing on behalf of the
 9    Defendants.
10
11    ALSO PRESENT:
12            Ms. Angel Rife
13            Mr. J.G.
14
15                    INDEX
16
17    EXAMINATION BY:            PAGE NUMBER:
18    Mr. Ford                        4
19
20    PLAINTIFF'S EXHIBIT:
21    1 January 23, 2007 Letter         19
22
23            I, ELIZABETH LAW, a Court
```

# FREEDOM COURT REPORTING

1   Reporter of Southside, Alabama, acting

2   as Commissioner, certify that on this

3   date, as provided by the Federal Rules

4   of Civil Procedure and the foregoing

5   stipulation of counsel, there came

6   before me at the law offices of Chad

7   Lee, 11 Main Street South, Wedowee,

8   Alabama, beginning at 2:23 p.m., MICHAEL

9   GOSDIN, witness in the above cause, for

10  oral examination, whereupon the

11  following proceedings were had:

12

13          MICHAEL GOSDIN,

14  being first duly sworn was examined and

15  testified as follows:

16

17  EXAMINATION BY MR. FORD:

18      Q.    Would you state your name,

19  please, sir?

20      A.    Michael John Gosdin.

21      Q.    And where do you live,

22  Mr. Gosdin?

23      A.    9100 County Road 258.

# FREEDOM COURT REPORTING

```
1            Q.      How long have you lived

2    there?

3            A.      Close to eight years.

4            Q.      All right.  And I understand

5    from your son's testimony that's a

6    mobile home --

7            A.      Yes, sir.

8            Q.      -- that's on land owned by

9    your father?

10           A.      Yes, sir.

11           Q.      Your father is Charles

12   Gosdin?

13           A.      Yes, sir.

14           Q.      And I understand he's been

15   ill --

16           A.      Yes, sir.

17           Q.      -- for a while?

18           A.      Yes, sir.

19           Q.      And you have heard your

20   son's testimony here about who lives in

21   the mobile home there with you, correct?

22           A.      Yes, sir.

23           Q.      And, as I understand it,
```

# FREEDOM COURT REPORTING 6

1  it's you, your daughter, your son,

2  J.G.?

3      A.    Right.

4      Q.    And your mother; is that

5  correct?

6      A.    Now.

7      Q.    Yeah, right now your mother?

8      A.    Yes, sir.

9      Q.    On April 14th of 2006, who

10  was living there?

11      A.    Leslie Miller, Chandler

12  Miller, Kelsey --

13      Q.    Your son?

14      A.    Right.

15      Q.    And you?

16      A.    Me.

17      Q.    I didn't mean to interrupt,

18  but I'm worried about what the Federal

19  Court says about using minors' names.

20      A.    That's right.

21      Q.    How long had the Millers

22  been there in the residence with you?

23      A.    Probably a year or so.

# FREEDOM COURT REPORTING    7

1            Q.    Had they been there longer

2    than J.G. had?

3            A.    Right.

4            Q.    When did he come to stay

5    with you?

6            A.    I think it was about four

7    months earlier than that.

8            Q.    And I understand you have

9    legal custody under some court decree?

10           A.    I do now, but I didn't then.

11           Q.    Was this some arrangement

12   with your --

13           A.    Right.

14           Q.    -- exwife that he would stay

15   with you?

16           A.    Right.

17           Q.    And now you have the legal

18   custody?

19           A.    Right.

20           Q.    Was that by agreement?

21           A.    Sir?

22           Q.    Was that by agreement, or

23   did you have to got to court and force

# FREEDOM COURT REPORTING    8

1    the custody?

2        A.    No, it was an agreement that

3    -- well, actually, she -- his mom lived

4    with me.   She moved out, and he stayed.

5        Q.    Oh, I see.  Thank you.  That

6    helps me.

7        A.    Okay.

8        Q.    Where do you work?

9        A.    City of LaGrange.

10       Q.    How long have you worked

11   there?

12       A.    Two years seven months.

13       Q.    All right.  What do you do

14   over there?

15       A.    I work with the landscaping

16   department.

17       Q.    For the City?

18       A.    Yes, sir.

19       Q.    What's the extent of your

20   education?

21       A.    Graduated high school.

22       Q.    Okay.  Before you moved to

23   this -- first of all, who owns the

# FREEDOM COURT REPORTING

1    mobile home?

2         A.      It's my dad's.

3         Q.      Charles Gosdin?

4         A.      Right.

5         Q.      Did he buy it when you moved

6    onto the property, or was it already

7    there or what?

8         A.      No.  When he got his cancer,

9    I actually bought it and moved it there

10   and sold it to him.

11        Q.      Oh, I see.  It was yours,

12   and you sold it to him?

13        A.      Right.

14        Q.      Do you pay him any rent or

15   anything for that?

16        A.      No, sir.  I actually --

17   well, actually, I do.  I pay the note --

18   the bank note for it.

19        Q.      I see.  The mobile home has

20   a lien on it?

21        A.      Right.

22        Q.      And you pay the note?

23        A.      Right.

# FREEDOM COURT REPORTING 10

1          Q.      What about utilities?   Who

2  pays those?

3          A.      I do.   But the utility bill

4  is in his name.

5          Q.      All right.   It's in his name,

6  but you pay it?

7          A.      Right.

8          Q.      What utilities do you have

9  available there?

10          A.      Right now just the

11  electrical bill, that's --

12          Q.      Water?

13          A.      We got a well right now.

14          Q.      Okay.

15          A.      They are actually running us

16  some county water down there.

17          Q.      Is there any gas?

18          A.      Yes, sir.   We do use gas.

19          Q.      Natural gas or propane?

20          A.      Right.   Hall's whatever that

21  is.

22          Q.      You got a big tank?

23          A.      250-gallon tank.

# FREEDOM COURT REPORTING    11

1          Q.     Do you have like cable TV or

2    dish?

3          A.     Right.

4          Q.     Whose name is that in?

5          A.     Actually --

6          J.G.:   Me.

7          A.     Yeah.   Actually, we don't

8    have any cable right now.

9          Q.     Okay.   Have you had it in

10   the past?

11         A.     Right.

12         Q.     Now, do you get your mail at

13   9100 County Road --

14         A.     258.

15         Q.     -- whatever it is?

16         A.     Roanoke, yes, sir.

17         Q.     And your dad gets his next

18   door?

19         A.     9110.

20         Q.     Has that been true since you

21   have lived there?

22         A.     Yes, sir.

23         Q.     And do you have phone

# FREEDOM COURT REPORTING    12

1    service at the trailer?

2         A.    We all have cell phones.

3         Q.    You all have cell phones?

4         A.    We have cell phones.

5         Q.    Okay.  Well, that's not a

6    bad idea, not a bad idea at all.

7              Does your father have a land

8    line, or does he use --

9         A.    He has a land line.

10        Q.    That's in his name?

11        A.    Yes, sir.

12        Q.    Are your phones all in your

13    name or the other persons living there?

14        A.    Right.

15        Q.    You pay the bills on those?

16        A.    (Witness nods head

17    affirmatively.)

18        Q.    And as I understand it -- I

19    have seen some pictures of the place.

20    How far would you say the house is from

21    the mobile home?

22        A.    40 feet.

23        Q.    All right.  And do you know

# FREEDOM COURT REPORTING  13

```
1   whose property this accident happened
2   on -- the name of the owner?
3          A.    I'm not sure of the guy's
4   name.
5          Q.    But it wasn't on your dad's
6   property, was it?
7          A.    Five-tenths of a mile from
8   our property.
9          Q.    How big is your father's
10  property there?  How much land is it?
11         A.    It's just one acre.
12         Q.    Okay.  Do you have a
13  driver's license?
14         A.    Yes, sir, I do.
15         Q.    What's the address on your
16  driver's license?
17         A.    3161 Louiana Road.
18         Q.    So you got your new
19  address -- new house number on there?
20         A.    Because I just had got a CDL
21  and put my new address on it.
22         Q.    Before that, what was
23  your --
```

# FREEDOM COURT REPORTING    14

1          A.      9100.

2          Q.      9100 County Road 258?

3          A.      Yes, sir.  Actually, I used

4  his address for a short period of time

5  until we got a mailbox down there.  And

6  then I went from his address to mine.

7          Q.      How long has it been since

8  you had your own mailbox?

9          A.      Seven, eight years.

10         Q.      Almost since you moved in?

11         A.      Right, shortly after.

12         Q.      How long have your parents

13  been divorced?

14         A.      Since about '90.

15         Q.      1990.

16         A.      Since about 1990.  Give or

17  take.  I had graduated high school.

18         Q.      Were they divorced here in

19  this county?

20         A.      Right.

21         Q.      Do you have any property

22  insurance on the mobile home --

23         A.      No, sir, not at the time.

# FREEDOM COURT REPORTING 15

1          Q.    -- or fire insurance?  Do

2    you have any liability insurance?

3          A.    Not at the time, no, sir.

4          Q.    Do you have any now?

5          A.    Actually, I don't.

6          Q.    I'm not sure whether you

7    understood me.  I'm asking about right

8    now do you have any?

9          A.    Oh, no, sir.  I don't think

10   so.

11         Q.    Did you have any in '06?

12         A.    No, sir.  When the accident

13   happened?

14         Q.    Yes.

15         A.    No, sir.

16         Q.    You heard J.G. testify about

17   the frequency with which he might visit

18   his grandfather --

19         A.    Right.

20         Q.    -- and so forth.  Do you

21   have any differences about that?  Do you

22   disagree with him about that?

23         A.    No.  That's pretty accurate.

# FREEDOM COURT REPORTING    16

1          Q.      He might stay overnight from

2    time to time?

3          A.      Occasionally.

4          Q.      He might have dinner there?

5          A.      Occasionally.

6          Q.      And your father might come

7    over to your place for dinner?

8          A.      He does.  Him and my mom are

9    like -- they are best of friends

10   actually.

11         Q.      It happens a lot.

12         A.      Yeah.  They were married 28

13   years.

14         Q.      Yeah.  Have -- all right.

15   How often would you say J.G. might go

16   over and stay overnight at least?

17         A.      No more than once a month.

18         Q.      For one day at a time -- one

19   night at a time?

20         A.      That's it.

21         Q.      Do you have available to you

22   the documents demonstrating that you got

23   legal custody -- that you now have legal

# FREEDOM COURT REPORTING    17

1    custody of J.G.?

2        A.    I'm sure he probably does.

3        Q.    Did Mr. Lee represent you in

4    whatever got done in that?

5        A.    Right.  Yes, sir.  I do have

6    them somewhere at home.

7        Q.    Where were you when you were

8    served with the Miller lawsuit?

9        A.    9100 County Road 258.

10       Q.    That's your home?

11       A.    Right.

12       Q.    And was J.G. served at that

13   same location, if you know?

14       A.    Yes, sir.

15       Q.    Where were you when you were

16   served with this lawsuit, the Cotton

17   States lawsuit?

18       A.    I'm not sure.

19       Q.    Okay.

20       A.    I'm not --

21       Q.    Do you have a key to your

22   dad's residence if you need to get in

23   there?

# FREEDOM COURT REPORTING

1           A.      No, sir.

2           Q.      And as I understand it, no

3    one else lives in the household with

4    him, or is that right?

5           A.      My sister lives there.

6           Q.      Oh, that's right.  Your

7    sister lives there.  That's right.  I'm

8    sorry.

9                   I'm going to ask you the

10   same question about these pleadings that

11   were filed where the allegation was made

12   that you are his father and natural

13   guardian.

14          A.      Right.

15          Q.      Do you know why that was

16   denied in the lawsuit?

17          A.      I'm sorry?

18          Q.      In the answer that you

19   filed -- that Chad filed for you --

20          A.      Okay.

21          Q.      -- that allegation is

22   denied, and I just wondered if I was

23   missing something, that you weren't his

# FREEDOM COURT REPORTING   19

1  natural father or you weren't his

2  natural guardian, so forth.  You don't

3  know any reason for that?

4        A.    I have no idea.

5              (Whereupon, Plaintiff's

6  Exhibit 1 was marked for identification

7  and same is attached hereto.)

8        Q.    And with respect to this

9  Plaintiff's Exhibit 1, which is a letter

10 from Cotton States to you and your

11 son --

12       A.    Okay.

13       Q.    -- do you recall receiving

14 that?

15       A.    Vaguely.

16       Q.    All right, sir.

17       A.    Honestly.

18       Q.    And is it correct what J.G.

19 said that nothing has really changed

20 about your living conditions or living

21 location or anything like that from

22 April of '06 until now except for the

23 identity to the people who reside there?

# FREEDOM COURT REPORTING  20

1          A.      Right.

2          Q.      Do you know where the

3    Millers live now?

4          A.      I think she -- back in

5    Douglasville or something.  I think she

6    went back with her exhusband.

7          Q.      Douglasville, Georgia?

8          A.      Right.

9          Q.      Do you know the status of

10   the lawsuit that they filed against you?

11         A.      I don't know.

12         Q.      Have you discussed it with

13   whatever attorney is defending it?

14         A.      (Witness shakes head

15   negatively.)

16         Q.      No?  Have you been contacted

17   by an attorney saying they are defending

18   you in this lawsuit?

19         A.      Just with him (indicating).

20         Q.      Okay.  Once J.G. came to

21   live with you -- and I think you said

22   that was about eight months before this

23   incident happened?

# FREEDOM COURT REPORTING     21

1          A.      About four months.

2          Q.      Four months.   I'm sorry.

3    Yeah.   If I misquote what you said, be

4    sure and tell me that.

5                  Has he continuously lived

6    there since then?

7          A.      (Witness nods head

8    affirmatively.)

9                  MR. FORD:   That's all I

10   have.

11             (FURTHER DEPONENT SAITH NOT)

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING   22

```
1                    C E R T I F I C A T E

2

3        STATE OF ALABAMA )
         ETOWAH COUNTY    )
4

5                     I hereby certify that the

6        above and foregoing proceeding was taken

7        down by me by stenographic means, and

8        that content herein was produced in

9        transcript form by computer aid under my

10       supervision, and that the foregoing

11       represents, to the best of my ability, a

12       true and correct transcript of the

13       proceedings occurring on said date at

14       said time.

15                    I further certify that I am

16       neither of counsel, nor of kin to the

17       parties to the action; nor am I in any

18       way interested in the result of said

19       cause.

20                    Elizabeth Law
                      _____
21                    Court Reporter and Commissioner

22                    ACCR#:  214

23
```



**Cotton States** INSURANCE AND AFFILIATES

1701 N. Towanda Avenue
Bloomington, IL 61702
www.cottonstatesinsurance.com

January 23, 2007




PLAINTIFF'S
EXHIBIT
_1_

Mr. Michael Gosdin
Mr. Justin Gosdin
9100 County Road 258
Roanoke, AL 36274

RE:    *Leslie Miller as Mother and Next Friend of Jonathon Miller, a minor vs. Michael Gosdin
and Justin Gosdin, a minor.*  Case No. CV06-291 in the Circuit Court of Chamber County,
State of Alabama.

| | |
|---|---|
| Our Claim No.: | 001302000041300 |
| Insured Name: | Charles W. Gosdin |
| Policy No.: | AHO-3355540 |
| Date of Loss: | April 16, 2006 |

### NOTICE OF DEFENSE UNDER
### RESERVATION OF RIGHTS

Dear Michael and Justin Gosdin:

The Complaint filed by Leslie Miller as Mother and Next Friend of Jonathon Miller, a Minor, has
been forwarded to this office for consideration whether coverage and defense of the lawsuit could
be afforded under the policy of insurance issued to Charles W. Gosdin, Policy Number
AHO3355540.

Cotton States Mutual Insurance Company hereby informs you of our reservation of rights to file an
action for declaratory judgment asserting that we have no duty to indemnify for any damages
resulting from the alleged negligence as stated in the above referenced Complaint.

On the date alleged in the Complaint, the homeowner's insurance policy issued to Charles W.
Gosdin provided the following language:

Home Office: Cotton States Mutual Insurance Company, Shield Insurance Company
244 Perimeter Center Parkway N.E., Atlanta, Georgia 30346

Home Office: COUNTRY Casualty Insurance Company
1701 N. Towanda Avenue, Bloomington, Illinois 61701

RE: 001302000041300
Page 2 of 4
January 23, 2007

## Section II – Liability Coverages
## Coverage E – Personal Liability

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1.    pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2.    provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

* * * * *

## Section II – Exclusions
1.    **Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to **bodily injury** or **property damage**:

* * *

d.    arising out of a premises:
    (1)    owned by an **insured**;
    (2)    rented to an **insured**; or
    (3)    rented to others by an **insured**;
that is not an **insured location**;

* * * * *

## Definitions:

In this policy, "you" and "your" refer to the "named insured" shown in the Declaration and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

* * *

RE: 001302000041300
Page 3 of 4
January 23, 2007

> 3. **"insured"** means you and residents of your household who are:
>
>   a.   your relatives; or
>
>   b.   other persons under the age of 21 and in the care of any person named above.
>
> 4. **"insured location"** means:
>
>   a.   the **residence premises**;
>
>   b.   the part of other premises, other structures and grounds used by you as a
>        residence and;
>        (1)   which is shown in the Declarations; or
>        (2)   which is acquired by you during the policy period for your use as a
>              residence;
>   c.   any premises used by you in connection with a premises in 4a or 4b above;
>   d.   any part of a premises:
>        (1)   not owned by an **insured**; and
>        (2)   where an **insured** is temporarily residing;
>   e.   vacant land, other than farm land, owned by or rented to an **insured**;
>   f.   land owned by or rented to an **insured** on which a one or two family
>        dwelling is being built as a residence for an **insured**;
>   g.   individual or family cemetery plots or burial vaults of an **insured**; or
>   h.   any part of a premises occasionally rented to an insured for other than
>        business use.

Our investigation to date reveals that you may not have been a resident of Charles W. Gosdin's household at the time of this occurrence. Our investigation further reveals that this occurrence may have arisen out of a premises that is not an insured location. If this is the case, coverage would not be afforded under Charles W. Gosdin's homeowner's policy Number AHO3355540.

As you are aware, Cotton States Mutual Insurance Company will provide you with legal counsel for the defense of this lawsuit and will pay said counsel a reasonable sum for their services . However, it shall be clearly understood that by providing you with counsel for the defense of this lawsuit, Cotton States Mutual Insurance Company shall not be deemed nor held to have waived its right to deny liability under the policy of insurance to which we have retained counsel and that such disclaimer of liability can be made by Cotton States Mutual Insurance Company at any time hereafter, for the reasons stated in this letter, or any other reason either during the pendency of this lawsuit or after the termination thereof.

RE: 001302000041300
Page 4 of 4
January 23, 2007


Should you have any questions or have additional information you would like me to consider, please feel free to contact me.

Sincerely,
Cotton States


Kristi G. Lewis
Claims Attorney I
Phone: (309) 821-2266
Fax:    (309) 820-4527

KGL/cfg

# EVIDENTIARY SUBMISSION

# 7

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

CASE NUMBER:   3:07CV422-WHA     ORIGINAL

COTTON STATES MUTUAL INS. COMPANY,

           Plaintiff,

           vs.

MICHAEL GOSDIN and J.G., a minor,

           Defendants.


           DEPOSITION OF J.G.


           S T I P U L A T I O N S


           IT IS STIPULATED AND AGREED

by and between the parties through their

respective counsel, that the deposition

of J.G. may be taken before ELIZABETH

LAW, Commissioner, at 11 Main Street

South, Wedowee, Alabama, on the 24th day

of January 2008.

           IT IS FURTHER STIPULATED

# FREEDOM COURT REPORTING    2

1    AND AGREED that the signature to and the

2    reading of the deposition by the witness

3    is waived, the deposition to have the

4    same force and effect as if full

5    compliance had been had with all laws

6    and rules of Court relating to the

7    taking of depositions.

8              IT IS FURTHER STIPULATED

9    AND AGREED that it shall not be

10   necessary for any objections to be made

11   by counsel to any questions except as to

12   form or leading questions, and that

13   counsel for the parties may make

14   objections and assign grounds at the

15   time of the trial, or at the time said

16   deposition is ordered in evidence, or

17   prior thereto.

18             IT IS FURTHER STIPULATED

19   AND AGREED that the notice of filing of

20   the deposition by the Commissioner is

21   waived.

22

23

# FREEDOM COURT REPORTING

3

```
 1                    APPEARANCES
 2              FORD, HOWARD & CORNETT, by
 3    Mr. George P. Ford, 140 South Ninth
 4    Street, Gadsden, Alabama, 35901,
 5    appearing on behalf of the Plaintiff.
 6              CHAD LEE, Attorney at Law,
 7    11 Main Street South, Wedowee, Alabama,
 8    36278, appearing on behalf of the
 9    Defendants.
10
11    ALSO PRESENT:
12              Ms. Angel Rife
13              Mr. Michael Gosdin
14
15                    INDEX
16
17    EXAMINATION BY:              PAGE NUMBER:
18    Mr. Ford                          4
19
20    PLAINTIFF'S EXHIBIT:
21    1 January 23, 2007 Letter          21
22
23              I, ELIZABETH LAW, a Court
```

# FREEDOM COURT REPORTING    4

1   Reporter of Southside, Alabama, acting

2   as Commissioner, certify that on this

3   date, as provided by the Federal Rules

4   of Civil Procedure and the foregoing

5   stipulation of counsel, there came

6   before me at the law offices of Chad

7   Lee, 11 Main Street South, Wedowee,

8   Alabama, beginning at 2:04 p.m., J.G.,

9   witness in the above cause, for oral

10  examination, whereupon the following

11  proceedings were had:

12

13                  J.G.,

14  being first duly sworn was examined and

15  testified as follows:

16

17  EXAMINATION BY MR. FORD:

18       Q.     For purposes of this -- let

19  me just ask him this off the record.

20              (Whereupon, a discussion was

21  held off the record.)

22       Q.     (By Mr. Ford) All right.

23  Are you J.G. that's identified in this

# FREEDOM COURT REPORTING

```
 1    lawsuit as a defendant?
 2         A.     Yes, sir.
 3         Q.     I'm going to go ahead and
 4    call you J.G. if that's okay --
 5         A.     Yes.
 6         Q.     -- as opposed to using your
 7    last name.  I can't say mister and your
 8    last name either.  So I'm going to do
 9    that if that's okay.  I'm here to ask
10    you some questions surrounding the
11    incident where you got sued by this
12    Miller person, about the shooting
13    incident that happened down near your
14    homeplace.
15         A.     Yes, sir.
16         Q.     So if there's anything that
17    I ask you that you don't understand,
18    just tell me you don't understand it,
19    and I'll try to rephrase it or something
20    where you do.  I'm not here to embarrass
21    you or scare you or threaten you or
22    anything like that.  I just want to ask
23    some questions so that we can move on
```

# FREEDOM COURT REPORTING   6

1    with this litigation that we are

2    involved with.

3              My name is George Ford, as I

4    told you.   I represent Cotton States

5    Insurance.

6              Tell me first:   How old are

7    you?

8         A.    15.

9         Q.    15.   What's your date of

10   birth?

11        A.    It's July 14, 1992.

12        Q.    Where do you presently live?

13        A.    I don't know the address.

14   9100 County Road 258.

15        Q.    Is that the same residence

16   you lived in when this shooting incident

17   occurred?

18        A.    Yes, sir.

19        Q.    Who lives there in that

20   residence with you?

21        A.    My dad and grandma and my

22   sister.

23        Q.    Your dad?

# FREEDOM COURT REPORTING    7

1          A.      Grandma and my sister.

2          Q.      Your dad Mike Gosdin is here

3    today, right?

4          A.      Yes, sir.

5          Q.      What's your sister's name?

6          A.      Kelsey?

7          Q.      And your grandmother?

8          A.      Yes, sir.

9          Q.      What is her name, please,

10   sir?

11         A.      Ann.

12         Q.      Ann?

13         A.      Gosdin.

14         Q.      Gosdin.  All right.  What

15   type of residence is this?

16         A.      Trailer.

17         Q.      Mobile home?

18         A.      (Witness nods head

19   affirmatively.)

20         Q.      Is that the same mobile home

21   you lived in at the time this happened?

22         A.      Yes, sir.

23         Q.      I understand you're in

# FREEDOM COURT REPORTING

8

```
 1    school at Wadley High School?

 2         A.     Yes, sir.

 3         Q.     What year are you in?

 4         A.     9th.

 5         Q.     All right.  Have you always

 6    gone to school there in Wadley?

 7         A.     First year.

 8         Q.     Where did you go before you

 9    started Wadley High?

10         A.     All schools or just last

11    year?

12         Q.     Just let's say high school

13    or junior high school.

14         A.     Rock Mills and Handley.

15         Q.     I'm sorry?

16         A.     Rock Mills and Handley.

17         Q.     She's trying to take this

18    down, and I'm kind of hard of hearing,

19    so if you could, if you could speak up

20    just a little bit --

21         A.     Yes, sir.

22         Q.     -- I would appreciate it.

23    Have you ever worked anywhere?
```

# FREEDOM COURT REPORTING    9

| | |
|---|---|
| 1 | A.    No, sir. |
| 2 | Q.    You're the grandson of |
| 3 | Charles Gosdin; is that right? |
| 4 | A.    Yes, sir. |
| 5 | Q.    Is he still living? |
| 6 | A.    Yes, sir. |
| 7 | Q.    I understood he was ill and |
| 8 | that's why I ask.  Where does he live? |
| 9 | A.    Right beside me. |
| 10 | Q.    All right.  As I understand |
| 11 | it, from seeing some pictures of the |
| 12 | area where you live, Charles Gosdin |
| 13 | lives in a house -- |
| 14 | A.    A house. |
| 15 | Q.    -- not too far from your |
| 16 | trailer; is that correct? |
| 17 | A.    20, 30 feet? |
| 18 | Q.    Does he have the same |
| 19 | mailing address that you have? |
| 20 | A.    No, sir.  It's 9110. |
| 21 | Q.    All right.  And his is? |
| 22 | A.    9110. |
| 23 | Q.    And yours is 9100? |

# FREEDOM COURT REPORTING    10

1          A.      9100.

2          Q.      Thank you.  How long have

3    you lived there at 9100?

4          A.      I don't know.

5          Q.      Has it been more than five

6    years?

7          A.      Off and on.

8          Q.      Where did you live -- where

9    have you lived other than in the mobile

10   home there with your dad?

11         A.      Valley, Chamber County,

12   Roanoke, everywhere.  My mom moves all

13   the time.

14         Q.      How long continually have

15   you lived there in the mobile home at

16   9100?

17         A.      About two years.

18         Q.      How long had you lived there

19   continually before this -- and when I

20   say continual I mean not that you went

21   to visit somebody, but you lived there

22   as your sort of permanent residence?

23         A.      I don't know.

# FREEDOM COURT REPORTING    11

```
 1          Q.      At least two years?
 2          A.      (Witness shakes head
 3  negatively.)
 4          MR. FORD:  I'm going to get
 5  to you.  I'm going to ask you about the
 6  same thing, Mike.
 7          A.      I have lived with my
 8  grandma.  And then really it's like
 9  she's like aunt.  And then her -- my
10  mom's husband and grandma too.
11          Q.      All right.  Are your
12  grandparents divorced?
13          A.      Yes, sir.
14          Q.      The Gosdin grandparents are
15  divorced?
16          A.      Yes, sir.
17          Q.      That explains why she lives
18  with y'all.
19          A.      Yes, sir.
20          Q.      Does anyone else live in the
21  household with Charles Gosdin next door
22  to you?
23          A.      Tiffany Gosdin, his
```

# FREEDOM COURT REPORTING    12

1    daughter.

2        Q.    How old is she?

3        A.    18.

4        Q.    All right.    At the time this

5    incident occurred, which, I believe, was

6    April 16th of 2006, who was living in

7    the mobile home household with you and

8    your sister and dad?

9        A.    His girlfriend and her kids.

10        Q.    That's the Miller lady?

11        A.    Leslie Miller.

12        Q.    And that's the lady whose

13    son -- she and her son have sued you

14    over this shooting incident, right?

15        A.    Yes, sir.

16        Q.    How long had they been there

17    living when this happened?

18        A.    I don't know.

19        Q.    You don't know?

20        A.    No, sir.

21        Q.    Would it have been more than

22    a year?

23        A.    I don't know.    I didn't -- I

# FREEDOM COURT REPORTING    13

```
1    don't -- I don't keep up with that.
2         Q.    Did you -- have you ever
3    lived for any length of time, say in
4    excess of two weeks, in the home there
5    next door with your grandfather?
6         A.    No, sir.
7         Q.    Did you ever visit him
8    overnight?
9         A.    Yes, sir.
10        Q.    How often would you do that?
11        A.    Hardly ever.
12        Q.    Hardly ever?
13        A.    No.
14        Q.    Less than once a month?
15        A.    Yes, sir.
16        Q.    Did y'all have meals
17   together or anything like that?
18        A.    Whenever he cooked, I did.
19        Q.    Would that be very often?
20   If it's like me, it's not.  I know.
21        A.    Most of the time we just fix
22   sandwiches.
23        Q.    Do you know how long your
```

# FREEDOM COURT REPORTING  14

1  grandmother and grandfather have been

2  divorced?

3          A.      15 -- 14 years.

4          Q.      14 or 15 years.  And where

5  did she live before she moved in with

6  y'all?

7          A.      Her son -- her other son.

8          Q.      Is that here in Randolph

9  County?

10         A.      No.  He lives in Roanoke.

11         Q.      Thank you.  Do you know who

12  owns the property where the trailer

13  sits?

14         A.      Oh, my grandpa.

15         Q.      And I guess he owns the

16  property there where his home is?

17         A.      Yes, sir.

18         Q.      There's no property

19  separating the two, is there?  Nobody

20  lives between --

21         A.      No, sir.

22         Q.      -- there?  Okay.  About the

23  property that -- where this accident

# FREEDOM COURT REPORTING    15

1    happened on the 16th of April in '06, I

2    understand, is somebody else's property?

3         A.    Yeah.  It's somebody else's.

4         Q.    It is just down in the woods

5    sort of?

6         A.    It's down -- I mean, it

7    ain't too far in the woods.

8         Q.    But it's not in a

9    subdivision or something like that?

10        A.    No.  It's just country.

11        Q.    How far from downtown Wadley

12   is your home, if you know?

13        A.    I don't know.

14        Q.    I know you've got a

15   learner's permit; you must know about

16   how far it is?

17        A.    I got no clue.

18        Q.    You don't know.  Okay.  Do

19   you have at the home there, the mobile

20   home, a separate phone from your

21   grandfather's home?

22        A.    Yes, sir.

23        Q.    And as I understand it,

# FREEDOM COURT REPORTING   16

```
 1    there is a mailbox for each house?
 2         A.    Yes, sir.
 3         Q.    Does your father get your
 4    mail at his mailbox?
 5         A.    Yes, sir.
 6         Q.    And your grandfather gets
 7    his mail at his?
 8         A.    Yes, sir.
 9         Q.    Do you have a learner's
10    permit?
11         A.    No, sir.
12         Q.    How long would you say was
13    the longest period of time in the last
14    four years, let's say, that you have
15    stayed at your grandfather's residence?
16         A.    One night.
17         Q.    One night?
18         A.    (Witness nods head
19    affirmatively.)
20         Q.    Did your sister stay over
21    there any more often than that?
22         A.    She used to.  Like two,
23    three days, maybe a week.
```

# FREEDOM COURT REPORTING    17

```
 1          Q.      She would stay two or three
 2   days?
 3          A.      Sometimes.
 4          Q.      Did he ever come over during
 5   his 2006 period of time and eat dinner
 6   with y'all or stay at your place?
 7          A.      He never stayed with us, but
 8   he ate.
 9          Q.      Ate dinner sometimes?
10          A.      (Witness nods head
11   affirmatively.)
12          Q.      Okay.   In your school
13   registrations when you register for
14   school and so forth, do you list your
15   address at 9100 --
16          A.      No, sir.
17          Q.      -- County Road --
18          A.      No, sir.   We are building a
19   house.
20          Q.      Oh, you are.   Where is that?
21          A.      3161 Louiana Road.
22          Q.      Louiana Road.   So your dad
23   is building a home?
```

# FREEDOM COURT REPORTING

18

```
 1          A.     Yes, sir.
 2          Q.     Okay.  How far is that from
 3  where you now live, if you know?
 4          A.     Ten minutes.
 5          Q.     Is that in an urban area as
 6  opposed to being in the country, or is
 7  that out in the county too?
 8          A.     Country.
 9          Q.     Do I understand that your
10  mother and father are divorced?
11          A.     Yes, sir.
12          Q.     Do you know if he has legal
13  custody of you and your sister?
14          A.     Yes, sir.
15          Q.     And there is some court
16  document, I guess, that would show
17  that?
18          A.     Yes, sir.
19          Q.     Where were they living when
20  they divorced?  What county?
21          A.     I don't know.
22          Q.     You don't know.  All right.
23  Where does your mother live now?
```

# FREEDOM COURT REPORTING     19

```
 1          A.     Mill Village.

 2          Q.     The Mill Village in what

 3   town?

 4          A.     Roanoke.

 5          Q.     I'm not from around this

 6   area, so you are going to have to

 7   enlighten me a little bit.

 8          A.     Okay.

 9          Q.     Where were you when you got

10   served with the lawsuit papers in the

11   Miller lawsuit?

12          A.     At the trailer, I guess.  I

13   don't know.

14          Q.     At the trailer?

15          A.     Yes, sir.

16          Q.     When we say the trailer, we

17   are talking about the mobile home you

18   and your dad live in at 9100 County

19   Road -- what is it?

20          A.     258.

21          Q.     358?

22          A.     258.

23          Q.     258.  All right.  Do you
```

# FREEDOM COURT REPORTING     20

```
1    have any -- do you keep any of your
2    belongings -- clothing or anything like
3    that at your grandfather's house?
4         A.    1 got knives up there he
5    keeps for me.
6         Q.    What's that?
7         A.    Knives, but that's about it.
8         Q.    Knives.  Okay.  Do you have
9    a key to his house if you want to go
10   over there --
11        A.    No, sir.
12        Q.    -- so you could get in if
13   you wanted to?
14              Okay.  Do you have any
15   particular plan to move in with him?
16        A.    No, sir.
17        Q.    You are satisfied where you
18   are?
19        A.    Yes, sir.
20        Q.    And you may not know this.
21   Your lawyer prepared an answer for you
22   to the claim that I filed, the lawsuit
23   that I filed.  And it said in there -- I
```

# FREEDOM COURT REPORTING  21

1   put an allegation in there that said

2   that you -- let me find it -- that you

3   were a resident citizen of the State of

4   Alabama, residing at 9100 County Road

5   258, Roanoke -- that's a Roanoke

6   address; is that right?

7          A.     Yes, sir.

8          Q.     And that Michael Gosdin was

9   your father and natural guardian.  And

10  the answer admits that you are a citizen

11  of Alabama and where you live, but it

12  says -- denies the rest of it.  Is

13  Michael Gosdin your natural father?

14         A.     As far as I know.

15         Q.     All right.  Well, I've got

16  to ask.  I'm sorry.  So you don't know

17  why that was denied then, right?

18         A.     Yes, sir.

19         Q.     Did you ever receive a

20  copy -- I'm going mark this 1.

21                (Whereupon, Plaintiff's

22  Exhibit 1 was marked for identification

23  and same is attached hereto.)

# FREEDOM COURT REPORTING    22

1    Q.    I'm going to show you what

2    the reporter has marked as Plaintiff's

3    Exhibit 1, J.G., and ask you:  That's a

4    letter addressed to you.  Do you recall

5    ever receiving that or your father

6    receiving it?

7        A.    I don't know.

8        Q.    Pardon me?

9        A.    I don't ever look at it.

10       Q.    Do you know if you received

11   it or not?

12       A.    I'm sure he did.  I don't

13   know.  I don't never read the mail.  I

14   couldn't tell you.

15       Q.    That address is correct for

16   you, correct?

17       A.    Yes, sir.

18       Q.    And for your dad?

19       A.    Yes, sir.

20       Q.    But you can't really say for

21   sure that you have seen that?

22       A.    No, sir.

23       Q.    All right.  During the time

# FREEDOM COURT REPORTING    23

1  between April the 16th of '06, when this

2  shooting accident happened, and now you

3  have remained at the same residence

4  throughout that time, correct?

5       A.    Yes.

6       Q.    The only thing you have

7  changed is you have changed your school?

8       A.    Yes, sir.

9       Q.    All right.  And that

10 different people live there now than

11 lived there on April 16th?

12      A.    Yes, sir.

13      Q.    All right.  As far as the

14 receipt of that letter, would you pretty

15 much rely on what your dad testified

16 about whether y'all got that or not?

17      A.    Yes, sir.

18      Q.    You wouldn't?

19      A.    I thought you said would.

20      Q.    Would you rely on what he

21 said?

22      A.    Yeah.

23      Q.    If he says he got it --

# FREEDOM COURT REPORTING    24

```
 1              A.      Yeah.

 2              Q.      -- do you agree?

 3              A.      Yes, sir.

 4              Q.      All right.  Do you know what

 5    the status of the lawsuit that the

 6    Millers filed against you is now?

 7              A.      No, sir.

 8              Q.      You haven't been to trial

 9    yet, I take it?

10              A.      No, sir.

11              Q.      All right.  Has your

12    deposition been taken in that lawsuit?

13              A.      I don't know what that is.

14              Q.      Not like this?

15              A.      (Witness shakes head

16    negatively.)

17              Q.      All right.  Have you had to

18    answer any written questions that were

19    submitted to you as part of that

20    lawsuit?

21              A.      Yes, sir.

22              Q.      No?

23              A.      Yes, sir.
```

# FREEDOM COURT REPORTING    25

```
 1              Q.      Yes, sir.  You have?

 2              A.      Yeah.

 3              Q.      Okay.  Thank you.  And I

 4     believe -- who is your attorney in that

 5     case?

 6              A.      I don't know.

 7              Q.      You don't know.  Have you

 8     ever talked to the attorney that's

 9     defending that case for that?

10              A.      I don't know.  I ain't

11     talked to nobody but -- just somebody

12     came down there from the police station

13     and where -- Chambers County.

14              Q.      The police investigated it,

15     right?

16              A.      (Witness nods head

17     affirmatively.)

18              Q.      You weren't charged with

19     anything, were you?

20              A.      No, sir.

21              Q.      Before your father started

22     building this new house, when you

23     registered for school or for other
```

# FREEDOM COURT REPORTING    26

1    things, what would you list as your

2    address?

3        A.    Well, I was living with my

4    mother, but I don't know her address.

5        Q.    All right.  And I may have

6    asked you this.  If I did, I apologize.

7    How long had you been living in the

8    trailer there with your dad when this

9    shooting accident happened?

10        A.    I don't know.  I couldn't

11    tell you.

12        Q.    Was it more than a month?

13        A.    It was more than a month.

14    Probably about five or six months at the

15    most.

16        Q.    Before that, you had lived

17    with your mother in Roanoke?

18        A.    Yes, sir.

19        MR. FORD:  All right.

20    That's all I have got of him.

21        MR. LEE:  Okay.

22        (FURTHER DEPONENT SAITH NOT)

23

# FREEDOM COURT REPORTING    27

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF ALABAMA  )
      ETOWAH COUNTY     )
 4

 5            I hereby certify that the

 6    above and foregoing proceeding was taken

 7    down by me by stenographic means, and

 8    that content herein was produced in

 9    transcript form by computer aid under my

10    supervision, and that the foregoing

11    represents, to the best of my ability, a

12    true and correct transcript of the

13    proceedings occurring on said date at

14    said time.

15            I further certify that I am

16    neither of counsel, nor of kin to the

17    parties to the action; nor am I in any

18    way interested in the result of said

19    cause.

20            _Elizabeth Law_____

21            Court Reporter and Commissioner

22            ACCR#:   214

23
```

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

COTTON STATES MUTUAL )
INSURANCE COMPANY,
                                                    )
    PLAINTIFF,
                                                    ) CASE NO:  3:07CV422-WHA
VS.
                                                    )
MICHAEL GOSDIN and J.G., a minor
                                                    )
    DEFENDANTS.
                                                    )

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

In support of its Motion for Summary Judgment, plaintiff submits that the following facts are undisputed.

1. The defendants herein, Michael Gosdin and J.G., his son, are named as defendants in a tort action filed in the Circuit Court of Randolph County, Alabama, viz:  Miller, et al v. Gosdin, et al., CV 06-291 (Evid. Sub. 1 – Cplt., pgphs. 5, 6; Evid. Sub. 5 – Answer, pgphs.  5, 6; Evid Sub. 2 – Miller Cplt.).  The Miller case will be referred to as the "underlying lawsuit".

2. On the date of the incident described in the underlying lawsuit, Michael Gosdin and J.G. lived together in a mobile home situated at 9100 County Road 258, Roanoke, Alabama (Evid. Sub. 1 - Cplt, pgph. 3; Evid. Sub. 5 - Answer, pgph. 3; Evid. Sub. 6- M. Gosdin Depo., p. 5, l. 23 to p. 6, l. 16;

Evid. Sub. 7 – J.G. Depo., p. 6, l. 12-18).

3.  The mobile home is situated on a parcel of land of approximately one acre, owned by Michael Gosdin's father (J.G.'s grandfather), Charles Gosdin (Charles).  (Evid Sub. 6 – M. Gosdin Depo. p. 8, l. 22 to p. 9, l. 23).

4.  Charles lives in a separate dwelling on this same acre, with the residences separated by about forty feet (Evid. Sub. 6 - M. Gosdin Depo., p. 12, l. 18-22; p. 13, l. 9-11).

5.  The mailing address for Charles Gosdin is 9110 County Road 258, Roanoke, Alabama (Evid. Sub. 6 – M. Gosdin Depo. p. 9, l. 18-23).

6.  J.G. had come to live with Michael Gosdin about four months prior to the date of the shooting incident of April 16, 2006, and continues to reside there (Evid. Sub. 6 – M. Gosdin Depo., p. 20, l. 20 to p. 21, l. 8).

7.  There are, and were on April 16, 2006, separate mailboxes for the two Gosdin residences.  (Evid. Sub. 6 – M. Gosdin Depo., p. 11, l. 12-22; Evid Sub. 7 - J.G. Depo., p. 9, l. 18-20).

8.  Michael Gosdin originally purchased the mobile home he and J.G. occupy, but later conveyed it to Charles Gosdin; but Michael makes the monthly payments on it to the lienholder/mortgagee (Evid. Sub. 6 – M. Gosdin Depo., p. 8, l. 22, to p. 9, l. 23).

9.  Neither Michael Gosdin nor J.G. has a key to Charles' residence (Evid.

Sub. 6 – M. Gosdin Depo., p. 17, l. 21 to p. 18, l. 1; Evid Sub. 7 – J.G. Depo., p. 20, l. 8-11).

10. Charles has a "land line" telephone service to his home. Michael Gosdin has no land line, but rather, relies on cellular phone service (Evid. Sub. 6 – M. Gosdin Depo., p. 12, l. 7-17).

11. Since moving in with Michael, J.G. has visited with Charles, overnight, perhaps once a month (Evid. Sub. 6 – M. Gosdin Depo., p. 15, l. 6 to p. 16, l. 5; Evid. Sub. 7 – J. G. Depo., p. 13, l. 7-15.

12. J.G. does not keep any of his belongings in Charles' house, except some knives. (Evid. Sub. 7 - J.G. Depo., p. 19, l. 23 to p. 20, l. 7).

13. Occasionally, Michael Gosdin and J.G. may have a meal at Charles Gosdin's home, or vice versa (Evid. Sub 6 – M. Gosdin Depo., p. 16, l. 1-8).

14. Michael Gosdin moved onto the subject property about 8 years ago (Evid. Sub. 6 – M. Gosdin Depo., p. 14, l. 7-11).

15. J.G. has never resided for any significant length of time in Charles Gosdin's residence. (Evid. Sub. 7 - J.G. Depo., p. 13, l. 2-6).

16. The utility bills at the mobile home occupied by Michael Gosdin and J.G. are paid by Michael Gosdin. (Evid. Sub. 6 – M. Gosdin Depo., p. 10, l. 1-7).

17. Also living in the mobile home with Michael Gosdin and J.G., at present, are Michael Gosdin's daughter, Kelsey, and Michael Gosdin's mother, who is J.G.'s grandmother and Charles Gosdin's ex-wife (Evid. Sub. 7 - J.G. Depo., p. 6, l. 19 to p. 7, l. 13).

18. At the time of the shooting incident made the basis of the underlying lawsuit, Michael Gosdin had no casualty or liability insurance applicable to the mobile home (Evid. Sub. 6 – M. Gosdin Depo., p. 14, l. 21 to p. 15, l. 3).

19. At the time of the shooting incident made the basis of the <u>Miller</u> lawsuit, Charles Gosdin had in effect a Homeowners policy issued by plaintiff Cotton States, covering his residence at 9110 County Road 258 (Evid. Sub. 3 – Policy, certified by Affidavit of Deborah D'Ambra).

20. After having been served with process in the underlying lawsuit, Michael Gosdin and J.G. made a demand upon plaintiff for defense and indemnification from said lawsuit, under the policy issued to Charles Gosdin (Evid. Sub. A - Cplt., pgph. 8; Evid. Sub. 5 - Answer, pgph. 8).

21. Upon receipt of said demand, plaintiff sent to defendants a "Reservation of Rights" letter, which Michael Gosdin acknowledged receiving (Evid. Sub. 4 – Letter; Evid. Sub. 6 – M. Gosdin Depo., p. 19, l.  8-15; Exh. 1 to M. Gosdin Depo.).

22. The instant Declaratory Judgment action followed ( Evid. Sub 1 – Cplt.).

s/George P. Ford
George P. Ford, Attorney for Plaintiff
Ford, Howard & Cornett, P.C.
P.O. Box 388
Gadsden, AL 35902
(256) 546-5432
ASB#4179-066g

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing upon the Clerk of the Court under the CM/ECF system which will send notification of such filing to the following:

Chad Lee, Esquire
P.O. Box 966
Wedowee, AL 36278

On this the 13th day of February, 2008.

s/George P. Ford
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

COTTON STATES MUTUAL      )
INSURANCE COMPANY,
                          )
    PLAINTIFF,
                          )
VS.                       ) CASE NO:  3:07CV422-WHA
                          )
MICHAEL GOSDIN and J.G., a minor
                          )
    DEFENDANTS.
                          )

## BRIEF IN SUPPORT OF MOTION FOR  SUMMARY JUDGMENT

This action is before the Court on Motion for Summary Judgment filed by

plaintiff, Cotton States Mutual Insurance Company (Cotton States).  Cotton States is

seeking declaratory relief from the duty to defend and/or indemnify the defendants,

Michael Gosdin and his son, J.G., from claims made against them in a tort action

filed in the Circuit Court of Randolph County, Alabama, viz:  Miller, et al v. Gosdin,

et al., CV 06-291 (the "underlying lawsuit").  No facts necessary to establish liability

or damages in the underlying lawsuit are necessary or relevant to this declaratory

judgment action.

Fed. R. Civ. P. 56(c) provides, in part, that Summary Judgment is proper, and

"shall be rendered forthwith" if the pleadings, depositions, Answers to

Interrogatories, and Admissions on file, together with the Affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The language of the rule "mandates the entry of Summary Judgment, after adequate time for discovery and upon Motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The mere existence of some factual dispute will not defeat Summary Judgment unless that factual dispute is material to an issue affecting the outcome of the case. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor. Chapman v. A. 1 Transport, 229 F. 3d 1012, 1023 (11th Cir. 2000); Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

At the time of the shooting incident made the basis of the underlying lawsuit, Cotton States had in force a policy of "Homeowners" insurance issued to Charles Gosdin, as named insured, covering a dwelling situated at 9110 County Road 258, Roanoke, Alabama (Evid. Sub. 3 – Policy, with attached certification of Deborah D'Ambra). Among other things, the policy contained "Personal Liability" coverages and exclusions (Evid. Sub. 3 – Policy, pp. 10-14 of 15 of form HO3). The pertinent language for the purposes of this action is found at page 10 of 15 of form HO3, at "COVERAGE E – Personal Liability":

COVERAGE E – Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.  We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

(Evid. Sub. 3 - Policy)

Plaintiff concedes for purposes of this Motion that the plaintiff in the tort action, Miller, sustained "bodily injury" caused by an "occurrence".  The question in issue herein is whether Michael Gosdin or J.G., or both, qualify as an "insured" under Charles Gosdin's policy.  The facts adduced at the depositions of Michael Gosdin and J.G. make clear that neither meets that definition.

The definition of "insured" is found on page 1 of 15 of the HO3 form, which states:

3. "**insured**" means you and residents of your household who are:
   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

.

.  .  .  (Evid. Sub. 3 – Policy).

The terms "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household (Evid. Sub. 3 – Policy, p. 1 of 15 of HO3, introductory wording to "DEFINITIONS" section).

In the instant case, the "named insured" is Charles W. Gosdin, 9110 County Road 258, Roanoke, Alabama 36274.  (Evid. Sub. 3 - Policy, p. 2, 3).  Charles was divorced, so he had no spouse (Evid. Sub. 6 – M. Gosdin Depo., p. 14, l. 12-14).  Moreover, Charles is not a defendant in the underlying action, (Evid. Sub. 2 – Miller Cplt.).

In order to qualify as an "insured" under the policy, Michael and/or J.G. must be "residents of your" [Charles'] household".  Their testimony belies any such contention.  Although the term "residents of your household" is not specifically defined in the policy, there is ample case law on that subject.  Of particular note, and somewhat parallel with the instant case, is that of Rice v. State Farm Fire & Cas. Co., 628 So.2d 582 (Ala. 1993).  In Rice, the son of the named insured was residing in a mobile home on his parents' (the named insureds') property.  The mobile home was about 100 feet from the home of his parents.  The son was 30 years old, and during the seven years the son had lived there, he had never stayed overnight with his parents.  A dog owned by the son bit a man who was delivering gas to the mobile home in which the son lived.  The injured party recovered a judgment against the son

in a civil action, and attempted to force the parents' liability insurer to pay it. State
Farm resisted, on grounds identical to those asserted in this action by Cotton States.
The Supreme Court of Alabama held in favor of State Farm, stating that in order to
be a "resident" of a household, an individual must be more than a temporary or
transient visitor, and must actually live in the same household for a period of some
duration. Id, at 584, citing Mathis v. Employers' Fire Ins. Co., 399 So.2d 273, 275
(Ala. 1981). Other similarities to the instant case were that the son in Rice did not
have a key to his parents' home nor did they have a key to his mobile home; he had
no belongings in his parents' home; and he paid the utility bills for the mobile home
in which he lived.

Citing other authorities, the Court in Rice held:

> "The controlling test of whether persons are residents of the
> same household at a particular time, within the meaning of the
> policy in question, is not solely whether they are then residing
> together under one roof. The real test is whether the absence of
> the party of interest from the household of the alleged insured is
> intended to be permanent or only temporary - - i.e., whether
> there is physical absence coupled with an intent not to return."
> Rice, at 584

In another "dog bite" case, a Florida appellate court reached the same
conclusion. In Philbin by and through Edwards v. American States Ins. Co., 729
So.2d 484 (Fla. App. 1999), the owner of the dog was leasing residential property, in
which he lived, from his parents. His dog attacked the minor plaintiff, leading to the
lawsuit. The parents had a homeowners policy which extended to the leased

property; but the parents had their own, separate residence in which they resided.  In brief, the Florida Appellate Court held that a policy having a "resident family household member" provision required that those members of the household dwell or live together on a permanent basis.  Even though the house was owned by his parents, they lived elsewhere; and he was held not to be a resident of their "household".

In a case which involved a shooting injury quite similar to the case we now have under consideration, the Supreme Court of New Hampshire found in favor of the defendant insurance company, as well.  In <u>Howard, Administratrix v. Hartford Ins. Co.</u>, 507 A.2d 230 (NH 1986), the plaintiff's decedent was killed by a shot fired by the son of the owners of the property on which the shooting occurred.  The decedent apparently was the live-in girlfriend of the son of the property owners; but she and the son resided in a separate house, albeit on the same property as the house in which the property owners/parents of the shooter lived.  The Court held that since the son lived in a separate structure on the insured property, he was not a "member of the household" of the property owners (his parents); and hence, no coverage was afforded to him under the policy.  In this particular case, as with the first case cited above, the two houses were separated only by about 100 feet or so.  The <u>Howard</u> case mentioned that its decision was consistent with the "weight of authority" and with settled rules of construction of policy language.  It cited a case which is cited in a

number of the other cases on this same issue, viz:  Hernandez v. Comco Ins., 57

So.2d 1368 (La. App. 1978), which stated:

> "The pattern which emerges from the myriad of decisions
> considering the term `household´ seems to be an emphasis on
> dwelling as a family under one head." Id, at 1371.

Going further, the New Hampshire Court stated:

> "We hold that someone living in a separate dwelling, though
> on the insured premises, is not a member of the named
> insured's household." Howard, at 232.

The Court of Appeals of Idaho also has considered this issue in a shooting

case, viz:  Aid Ins. Co. v. Armstrong, 811 P.2d 507 (Ida. App. 1991).  In that

particular case, the parents of the teenaged shooter had been divorced for several

years.  Custody was granted to the child's mother, but when the child became a

teenager, she developed a severely strained relationship with her mother and

stepfather.  Consequently, she went to live with her father in another town.  Several

months after moving in with her father, the girl accidentally shot the plaintiff with a

BB gun.  Shortly thereafter, she moved back to the residence of her mother, some 20

miles away.  After settling with the insurer for the father (with whom the child was

living at the time of the shooting), the plaintiff sought further recovery from the

insurance carrier for the stepfather and mother, who still technically had legal

"custody" of the child, even though she had been living with her father at the time.

The Court of Appeals of Idaho held that at the time of the shooting, the teenage

shooter was not a "resident" of the stepfather's "household"; and denied coverage under the stepfather's policy.  The evidence was clear to the effect that, when the teenager left her mother's residence to move in with her father, it was everyone's intention that she would live in that household until she became an adult, which would have been some four or five years.  Everyone testified that that was the intent of all of them, at the time the move originally was made; and the fact that the situation changed after the shooting had no impact on the interpretation of the policy.  Quoting from an earlier Idaho case, the court stated that the term "resident" has been said to connote a living arrangement with some degree of permanence, while "household" has been held to mean residents who dwell under the same roof and compose a family.

Other cases which have rendered this same construction of the words "insured", "resident" and "household" are:  <u>Sutton v. Shelter Mut. Ins. Co.</u>, 971 SW.2d 807 (Ky. App. 1997); <u>Buckston v. Allstate Ins. Co.</u>, 434 So.2d 605 (La. App. 1983); and <u>Watt by Watt v. Mittelstadt</u>, 690 SW.2d 807 (Mo. App. 1985).  Sample discussions from some of those cases are as follows:

> The 1981 New College Edition of The American Heritage Dictionary of the English Language defines household as "a domestic establishment including the members of a family and others living under the same roof."  Further, Black's Law Dictionary 666 (5th Ed. 1979) defines household as: [a] family living together. . . .  Those who dwell under the same roof and compose a family . . .  Term "household" is generally synonymous with "family" for insurance purposes, and includes

those who dwell together as a family under the same roof. <u>Sutton</u>, supra, at 808.

Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness. <u>Watt</u>, supra at 814.

Here, the evidence is overwhelming in favor of Cotton States. Michael Gosdin and J.G. lived in the mobile home at 9100 County Road 258, whereas the insured under the Cotton States policy, Charles Gosdin, lived in a separate dwelling with a separate address of 9110 County Road 258. (Evid. Sub. 1 – Cplt., pgph. 3; Evid. Sub. 5 – Answer, pgph. 3; Evid. Sub. 6, M. Gosdin Depo., p. 5, l. 23 to p. 6, l. 16; p. 12, l. 18-22; p. 13, l. 9-11; Evid. Sub. 7 – J.G. Depo., p. 6, l. 12-18). They had separate mailboxes; separate phones, and separate utilities (Evid. Sub. 6 – M. Gosdin Depo., p. 10, l. 1-7; p. 11, l. 12-22; p. 12, l. 7-17; Evid. Sub. 7 – J.G. Depo., p. 6, l. 12-18). Only occasionally did they even visit, house to house; and never for long. (Evid. Sub. 6 – M. Gosdin Depo., p. 15, l. 16 to p. 16, l. 8; Evid. Sub. 7 – J.G. Depo., p. 13, l. 7-15).

J.G. had nothing but a few knives stored in the insured dwelling (Evid. Sub. 7 – J.G. Depo., p. 19, l. 23 to p. 20, l. 7); and neither defendant had a key to the insured dwelling (Evid. Sub. 6 – M. Gosdin Depo., p. 17, l. 21 to p. 18, l. 1; Evid. Sub. 7 –

J.G. Depo., p. 20, l. 8-11).  Michael Gosdin and J.G. lived in the mobile home, along with Michael's daughter and the plaintiffs in the underlying case at the time of the shooting (Evid. Sub. 6 – M. Gosdin Depo., p. 6, l. 9-16; Evid. Sub. 7 – J.G. Depo. p. 12, l. 4-15).  Now they live with Michael's daughter and his mother, who is the named insured's ex-wife (Evid. Sub. 6 – M. Gosdin Depo., p. 5, l. 23 to p. 6, l. 6; Evid. Sub 7 – J.G. Depo., p. 6, l. 19-22).  Recently, even, Michael and J.G. have changed their addresses, for school or work purposes, to a new address where Michael is having a home built for them - - thereby even leaving Charles' curtilage (Evid. Sub. 6 – M. Gosdin Depo., p. 13, l. 15021; Evid. Sub. 7 – J.G. Depo., p. 17, l. 12 to p. 18, l. 5).

Clearly, these defendants had a dwelling in which they resided and which was wholly separate and apart from that of Cotton States' insured, Charles Gosdin.  While they "dwelt as a family under one head", it was not as Charles' family, but as Michael's.  Charles had his own "household" which included neither Michael nor J.G.  Neither of them had lived, or intended to live, with Charles under one roof, with Charles as the head of a unified "household".  They may as well have lived miles away, as far as the definition of a "household" is concerned.

For all of the above reasons, Cotton States Mutual Insurance Company is entitled to a ruling in its favor on all of the issues raised in this action; and this Court should so hold.

Respectfully submitted,


s/George P. Ford
George P. Ford, Attorney for Plaintiff
Ford, Howard & Cornett, P.C.
P.O. Box 388
Gadsden, AL 35902
(256) 546-5432
ASB#4179-066g


## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing upon the Clerk of the Court under the CM/ECF system which will send notification of such filing to the following:

Chad Lee, Esquire
P.O. Box 966
Wedowee, AL 36278

On this the 13th day of February, 2008.


s/George P. Ford
Of Counsel